[No. F003634. Fifth Dist. Mar. 5, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
ROGER WILLIAM TIERCE, Defendant and Appellant.

**[Opinion certified for partial publication.*]**

*Part II (only) is not published, as it does not meet the standards for publication contained in rule 976(b), California Rules of Court.

**Counsel**

Hugh B. Fielder, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Nancy Sweet and Edmund D. McMurray, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**RANDALL, J.**\*—Defendant, Roger William Tierce, was charged with a violation of Health and Safety Code section 11358, planting, cultivating, harvesting, drying, or processing marijuana.

Prior to the commencement of trial, defense counsel requested that Tierce be given diversion. The request was denied.

At trial, defense counsel moved to exclude testimony regarding certain of Tierce's statements because a police officer had destroyed the notes he took when Tierce made the statements. The motion was denied. The jury returned a verdict of guilty.

### FACTS

On September 18, 1983, Tulure County Deputy Sheriff Reid Hopkins went hiking in the mountains looking for a marijuana plantation that had been reported. He was accompanied by Deputy Lutz. After hiking approximately four and a half miles they spotted Tierce some distance from the trail sitting between a table and a tent next to a fire ring at an unimproved campsite. Hopkins approached Tierce to talk to him and observed guns on the table. He walked around Tierce and from the outside of the tent he looked into the tent and saw what he thought was marijuana in four cans. He seized the marijuana, two books and one magazine from the tent. The books dealt with drugs and the cultivation of marijuana.

Hopkins advised Tierce of his *Miranda* rights and Tierce agreed to talk. Hopkins asked Tierce if the campsite was his, if the substance in the cans was marijuana and if it belonged to him. Tierce replied affirmatively to each question. When asked where the marijuana came from, Tierce stated that he had "taken it" from a plantation approximately one mile up the creek. He agreed to take the officers to this site.

At the plantation the officers found 184 marijuana plants. Several plants had been pulled up and were hanging on a barbed wire fence. There was a hose watering the plants which was connected to a nearby tributary of the creek. In addition to the plants, the officers found a couple of pieces of canvas, plastic tent stakes, mousetraps, matchbooks, plastic chopsticks, a fire ring, a wooden platform and fishing line (used to secure the plants to the stakes).

---

\*Assigned by the Chairperson of the Judicial Council.

At Tierce's campsite the officers found canvas, tent stakes, mousetraps, matches, fishing line and plastic chopsticks, all of which matched the items found at the plantation. The officers also found fertilizer, ammonia sulfate, potash, bone meal, liquid Sevin insecticide and a soil Ph testing kit at the campsite.

Of the four cans discovered in the tent, two had leaves in them and two had stems. Some of the leaves had moisture in them although the upper leaves in the cans were dry. Laboratory analysis confirmed that the leaves from the cans and a sample seized from the plantation were marijuana.

## DEFENSE

Tierce testified that he wanted to get away from the city and go up to the mountains. While camping in the mountains with his friend, John Cahill, they met two men. These men told them about a marijuana garden they had planted and took Tierce to see it. He visited the growing site several times. The last time he traveled to the garden was two weeks prior to his arrest. It looked as if it had been abandoned. Tierce grabbed several plants that had previously been pulled from the ground and were hanging on the fence. He also grabbed a piece of canvas, wrapped up several items he thought he could use later and brought them back to his campsite. He pulled the leaves off the stems of the plant so he could smoke them. He denied any participation in growing the plants or pulling them from the ground. He admitted telling the officer the marijuana at the campsite was his.

## ISSUES

Defendant raises three issues on appeal: 1. That the trial court committed reversible error by failing to grant the defendant's "*Hitch*"[1] motion at trial;

2. That the trial court committed error by denying defendant's motion for diversion pursuant to the provisions of Penal Code section 1000 et seq. based on an erroneous belief that the existence of another drug-related charge precluded diversion; and

3. That defendant's conviction must be reversed because, as a matter of law, picking leaves off a previously harvested marijuana plant does not constitute a violation of the provisions of Health and Safety Code section 11358.

---

[1] Referring to the holding of the California Supreme Court in *People* v. *Hitch* (1974) 12 Cal.3d 641 [117 Cal.Rptr. 9, 527 P.2d 361].

DISCUSSION

I. DID THE TRIAL COURT ERR IN FAILING TO GRANT DEFENDANT'S MOTION BASED UPON THE DESTRUCTION OF THE ARRESTING OFFICER'S NOTES TAKEN DURING TIERCE'S INTERROGATION?

 Tierce's *Hitch* motion to exclude certain of his statements to Deputy Hopkins was made in reliance upon our decision in *People* v. *Jones* (1983) 145 Cal.App.3d 751 [193 Cal.Rptr. 663], as it applied the reasoning of *People* v. *Hitch, supra,* to the destruction of police field notes. At the hearing on that motion Deputy Hopkins was called by defendant's trial counsel and testified that when he questioned Tierce at the campsite he took notes. The notes of Tierce's statements consisted of one page measuring approximately three inches by two inches. He took the notes so that he could accurately recall what was said in order to write his police report. Hopkins wrote his report six hours after making the notes. While the report was more elaborate than the notes, Hopkins testified he accurately transcribed the notes. He subsequently threw the notes away as he was not aware of any policy to preserve such notes having been established by the Tulare County Sheriff's Department.[2]

At the motion hearing Deputy Hopkins testified that he believed Tierce told him he had been to the plantation and "picked" some of the plants. In his police report Hopkins stated that Tierce had "taken" the marijuana. However, the report also used the word "picked." During his testimony before the jury, Officer Hopkins testified that Tierce stated he had "taken" the marijuana.

Defense counsel argued that whether or not Tierce said he picked the marijuana or said he had taken the marijuana was crucial to his defense. The trial court denied the motion saying: ". . . I think this falls in the category of no harm, no fault. It seems to me that even if these notes were available that defense certainly could not be better off with those notes. They may be worse off if the officer now recalls, and I haven't heard his testimony yet, that the defendant said, 'I picked the marijuana.' He can always testify to what he recalls regardless of what notes he made, so it seems to me the defense is much better off having an official police report that uses the words, 'I took the marijuana,' than you would be if you had the original notes that for all I know might have said, 'I picked the marijuana.'" Following more argument by defense counsel the court stated: "I think the key issue really is whether an officer has accurately set out in any

---

[2]Nothing in the record before us indicates that the Tulare County Sheriff's Department did have a policy requiring the preservation of field notes at the time Tierce was arrested.

writing he made in an official capacity what actually occurred. I think one thing I have to consider is this report was made only hours after the [actual] events took place. The officer testified that he did use his notes in his effort to accurately set out the matters in that report and I am, of course, well aware that sometimes errors in transcripts occur or errors are made in making out reports, but I do not feel in the entire context of this case that the Defendant has been prejudiced by the lack of those notes, and I'm not going to exclude his statements based on your motion."

Tierce contends that the trial court committed reversible error by failing to grant his motion for the following reasons:

1. That the evidence demonstrated there were no reasonable precautions taken to preserve the officer's notes and this was at least negligent;

2. Deputy Hopkins' police report was inconsistent with his testimony at the *Hitch* motion on the critical issue of whether he picked or took the marijuana plant;

3. Defense counsel was denied effective and crucial cross-examination of Deputy Hopkins because he had no access to the field notes; and

4. The notes were highly material because the manner in which Tierce obtained the marijuana was the sole issue at trial and Hopkins' precise words may have been exculpatory.

Respondent advanced various reasons why the trial court's ruling should be upheld. One of these reasons was that even if *People* v. *Jones, supra,* 145 Cal.App.3d 751 was rightly decided, the recent United States Supreme Court case of *California* v. *Trombetta* (1984) 467 U.S. 479 [81 L.Ed.2d 413, 104 S.Ct. 2528] controls the issue.

Because we hold, in light of the guidance provided by the opinion in *California* v. *Trombetta, supra,* that *People* v. *Jones* has been effectively overruled, we need not discuss the other contentions of the respective parties to resolve this issue.

*People* v. *Jones, supra,* 145 Cal.App.3d 751 was decided in an opinion filed on August 5, 1983. At that time the California Constitution had been amended by the passage of Proposition 8 on June 8, 1982, to add article I, section 28, subdivision (d), commonly referred to as the Truth-in-Evidence provision. ■ The effect of that provision was, inter alia, to require the courts of this state to look to federal law in deciding issues concerning the exclusion of evidence. For, as the California Supreme Court recently said

in *In re Lance W.*: "What Proposition 8 does is to eliminate a judicially created *remedy* for violations of the search and seizure provisions of the federal or state Constitutions, through the exclusion of evidence so obtained, except to the extent that exclusion remains federally compelled." (*In re Lance W.* (1985) 37 Cal.3d 873, 886-887 [210 Cal.Rptr. 631, 694 P.2d 744].)

*People* v. *Jones* relied upon *People* v. *Hitch, supra,* 12 Cal.3d 641. There the California Supreme Court held that the obligation to disclose favorable evidence to the defense, under the Fourteenth Amendment due process clause of the United States Constitution, carries with it a correlative duty to also preserve material evidence in its possession. Evidence is material if there is a reasonable possibility it would be favorable to the defendant on the issue of guilt or innocence. (*Id.,* at pp. 649-654.) The *Hitch* opinion relied upon state law for its development of the test of materiality contained therein.

In view of the mandate of California Constitution, article I, section 28, subdivision (d), both the due process issue and the materiality issue in the case now before us must be decided by virtue of the application of principles of federal law. *California* v. *Trombetta, supra,* 467 U.S. 479 [81 L.Ed.2d 413, 104 S.Ct. 2528], having defined the limits of the federal due process clause and established the applicable materiality standard in the area of our present concern, becomes the guide upon which we must determine the continued viability of the *Jones* case.

In *Trombetta* the police failed to preserve intoxilizer breath samples of suspected drunk drivers. The defendants filed motions to suppress the test results on the ground that the officers failed to preserve the tests, therefore denying them the ability to impeach the incriminating test results. The California Court of Appeal ruled that due process demanded that the breath samples be preserved. ■ The Supreme Court of the United States reversed, holding that to meet the requirement of constitutional materiality the "evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and also be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (*California* v. *Trombetta, supra,* 467 U.S. 479, — [81 L.Ed.2d 413, 422, 104 S.Ct. 2528, 2534].)

The *Trombetta* court relied in its analysis of the due process rights of the *Trombetta* defendants upon the reasoning of the earlier case of *Killian* v. *United States* (1961) 368 U.S. 231 [7 L.Ed.2d 256, 82 S.Ct. 302]. There the defendant argued that the destruction by F.B.I. agents of preliminary notes used to prepare an investigatory report had violated his due process

rights because the notes would have been helpful to his defense. The Supreme Court ruled that the destruction of the notes did not give rise to a claim of constitutional dimensions for "[i]f the agents' notes . . . were made only for the purpose of transferring the data thereon . . ., and if, after having served that purpose, they were destroyed by the agents in good faith and in accord with their normal practice, it would be clear that their destruction did not constitute an impermissible destruction of evidence nor deprive petitioner of any right." (*Id.*, at p. 242 [7 L.Ed.2d at p. 264].)

It has been said of *Killian* that there "[t]he Supreme Court . . . enunciated its standard for evaluating the legal effect of notes destruction by directing lower courts to make findings on three points: (1) whether the notes were made for the purpose of transferring the data, (2) whether the agent acted in good faith in destroying the notes, and (3) whether the agent acted in accordance with the normal procedure of the governmental unit in so destroying the notes. The court held the absence of at least one of those elements to be a necessary, but not a sufficient, condition for a new trial. In order to obtain that remedy, the defendant must also overcome the doctrine of harmless error and demonstrate that the particular destruction of evidence resulted in *actual harm* to the defense." (Note, *The Right to Independent Testing: A New Hitch in the Preservation of Evidence Doctrine* (1975) 75 Colum.L.Rev. 1355, 1357, fns. omitted.)

In the *Jones* case we imposed the following standard: ". . . a police officer must take reasonable precautions to preserve for trial his original handwritten notes made in the course of interrogating a criminal defendant unless the interrogation is tape recorded and the tape is preserved for trial. 'Reasonable precautions' mean a good faith attempt to adhere to systematic procedures designed to preserve the notes for trial. If the officer fails to comply with this rule, the sanction will be suppression of all testimony by the officer concerning any statements made by the defendant during interrogation, assuming the requisite showing of materiality has been made." (*People* v. *Jones, supra,* 145 Cal.App.3d at pp. 753-754.)

Since the *Jones* holding conflicts with the federal standards enunciated in *Killian* and *Trombetta* that holding no longer accurately reflects the law in this state.

Applying the *Killian* standard to the testimony adduced from Deputy Hopkins at the *Hitch* hearing in the instant case it is apparent that Hopkins made his initial notes solely for the purpose of aiding his preparation of his police report. He obviously acted in good faith in destroying his notes in that he did not to his knowledge violate departmental procedure in doing so and did not deviate from his normal practice in that regard. Furthermore,

no evidence was adduced to indicate that the destruction of his notes departed from the normal procedure of his governmental unit with regard to the preservation of such materials. Consequently, the ruling of the trial court was correct.[3]

## II. DOES AN ARREST FOR ANOTHER DRUG-RELATED CRIME, SALE OF METHAMPHETAMINES, PRECLUDE ONE FROM BEING CONSIDERED FOR DIVERSION?*

. . . . . . . . . . . . . . . . . . . . . . . . . .

## III. DOES PICKING LEAVES OFF OF A PREVIOUSLY HARVESTED MARIJUANA PLANT CONSTITUTE PROCESSING WITHIN THE MEANING OF HEALTH AND SAFETY CODE SECTION 11358?

 Health and Safety Code section 11358 provides: "[e]very person who plants, cultivates, harvests, dries, or processes any marijuana or any part thereof, except as otherwise provided by law, shall be punished by imprisonment in the state prison."

At trial Tierce testified that he took between five and ten marijuana plants that had previously been pulled from the ground which he found hanging over a fence. He pulled the leaves off the stems of these plants so he could smoke them.

During his final argument the prosecutor contended that the quantity of marijuana has nothing to do with the charge. He went on to argue that Tierce's statement that he "pulled the leaves from the stems and separated it" was sufficient to constitute processing.

The jury was given the following instruction: "Defendant is charged in the Information, with the commission of the crime of violation of Section 11358 of the Health and Safety Code.

"Every person who plants, cultivates, harvests, dries, or processes any marijuana, or any part thereof, with the knowledge that it is marijuana, or

---

[3]We note that even had the officer's destruction of the notes not met the *Killian* due process standard, thus triggering further inquiry pursuant to the materiality test of *Trombetta*, we would undoubtedly reach the same result, because the statements of Tierce were predominantly inculpatory and thus did not "possess an exculpatory value that was apparent before the evidence was destroyed . . . ." (*California* v. *Trombetta, supra,* 467 U.S. at p. 479 [81 L.Ed.2d at p. 422, 104 S.Ct. at p. 2534].)

*See footnote *ante,* page 256.

a part [thereof], is guilty of the crime of violation of Section 11358 of the Health and Safety Code.

"In order to prove the commission of such crime, each of the following elements must be proved:

"1. That a person planted, cultivated, harvested, dried or processed more than one marijuana plant, and

"2. That such person knew it was marijuana plants or some part thereof."

They were also instructed that "The defendant is charged with the offense of having planted, cultivated, harvested, dried, or processed marijuana. He may be found guilty if the proof shows beyond a reasonable doubt that he committed any one or more of such acts, but in order to find the defendant guilty, all the jurors must agree that he committed the same act or acts. It is not necessary that the particular act or acts committed so agreed upon be stated in the verdict."

Following instructions the jury began deliberating at 10:40 a.m. At 11:32 a.m. the jury returned to the courtroom after sending out a note which asked " 'Does the fact that he picked leaves off the plant mean that he was processing marijuana?' " The court then made the following comments to the jury: "As I interpret the question, you're wrestling with the issue of what acts may or may not constitute processing. Now, the best I can do to help you in this would be to simply give you the dictionary definition of the verb 'to process,' make your own determination as to how that applies to the facts of the case. This is from the Webster's New International Dictionary, Second Edition. 'To process: To subject to some special process or treatment; to heat, as fruit, with steam under pressure, so as to cook or sterilize. To subject raw material to a process of manufacture, development, preparation for the market, et cetera; to convert into marketable form, as livestock by slaughtering, grain by milling, cotton by spinning, milk by pasteurizing, fruits and vegetables by sorting and repacking. To make usable, marketable, or the like, as waste matter or an inferior, defective, decomposed substance or product by a process, often a chemical process; as, to process rancid butter, rayon waste, coal (dust), beet sugar.'

"I don't know if that helps or not. That's the best I can do for you." The jury retired again at 11:35 a.m. and at 11:56 a.m. returned their verdict.

Tierce contends that to "interpret the picking of leaves off a marijuana stem, by one who is not connected with the growing of the marijuana, as

constituting cultivation, is to stretch logic beyond the breaking point." He argues that the verdict of the jury was *legally* incorrect: "As the court is no doubt aware from its reading of the literature, marijuana usually arrives in the possession of casual users with seeds and stems mixed in with the marijuana. The casual user separates or *processes* the seeds away from the usable marijuana. Similar[ly], the user will also pick the usable leaves off of the marijuana stems in preparation for use if the marijuana arrives in the user's possession still connected to the stems.

"As is apparent, the small user of marijuana normally engages in the act of 'processing' marijuana before use. Thus, if processing of marijuana, within the ambit of Health and Safety Code section 11358, can occur separately from any acts of planting or harvesting, then virtually all casual users of marijuana engage in the prohibited act of cultivation whenever they prepare to use marijuana! Appellant submits that such ludicrous extension of the reach of the cultivation statute was never intended by the legislature when it enacted the statute."

■ Although Tierce repeatedly focuses on the word "cultivation" as descriptive of the code section, Health and Safety Code section 11358 is set forth in the disjunctive; therefore, a person who plants, cultivates, harvests, dries *or* processes marijuana is guilty of a violation of this section. Only one of the enumerated acts need by proven to uphold a conviction, but the jury must all agree upon the same act.

■ Respondent contends that the issue before the court is really one of substantial evidence, and argues that there was ample evidence before the jury to justify a finding defendant was cultivating marijuana. While that is certainly true, we cannot ignore the fact that the jury posed a specific question indicating its attention had been focused on one particular aspect of the case, that of the activity of picking the marijuana leaves from their stems. The fact they returned a verdict within minutes of the judge's instruction defining processing would imply that at the least one or more of the jurors was prepared to convict only if the act of picking the leaves from the stems constituted a violation of Health and Safety Code section 11358.

Since there appear to be no cases in this state defining processing as used in Health and Safety Code section 11358, Tierce's argument that the Legislature cannot have intended the act of separating marijuana leaves from their stems to constitute processing because it cannot have intended the section to apply to the casual user of the drug bears discussion.

Health and Safety Code section 11357, subdivision (b) provides in pertinent part: "Except as authorized by law, every person who possesses not

more than 28.5 grams of marijuana, other than concentrated cannabis, is guilty of a misdemeanor and shall be punished by a fine of not more than one hundred dollars ($100)." The Legislature thus saw fit to mitigate the punishment of those who possessed marijuana in quantities that would indicate it was for personal use.

Penal Code section 1000—the drug diversion statute—states in pertinent part that diversion shall only apply to violators of Health and Safety Code section 11358 "if the marijuana planted, cultivated, harvested, dried or processed is for personal use." Thus it is clear that the Legislature, while wishing to distinguish between the casual user and the drug dealer, does consider the acts of planting, cultivating, harvesting, drying or processing marijuana to be violative of the statute regardless of whether or not the activity is for personal, rather than commercial, use. It seems equally clear that the Legislature did not base its distinctions of punishment solely upon the type of user, but also upon the acts committed (e.g., possession of a small quantity of the substance versus its cultivation and processing). "In facing a multitude of evils, the Legislature may consider such remedy as it deems, in its discretion, appropriate to the circumstances." (*Bosco* v. *Justice Court* (1978) 77 Cal.App.3d 179, 187 [143 Cal.Rptr. 468].)

There remains to be determined the question whether the act of picking leaves off the stem of a marijuana plant constitutes processing. Although there are no cases in California which discuss the meaning of the term "processes" in the context of marijuana production, we find two cases from other jurisdictions which employ the term in such a fashion as to clearly demonstrate the word is commonly utilized to encompass just such activity as that admitted by defendant in the instant case.

In *State* v. *Hague* (1975) 303 Minn. 100 [225 N.W.2d 852] the defendant was convicted of manufacturing, or possessing with the intent to manufacture, marijuana. During the factual discussion the court stated "[t]he marijuana had been processed to the extent that it had been picked, the leaves separated from the main stem of the plants, and dried. At this point all one would have to do to smoke the marijuana would be to shred it." (*Id.,* at pp. 853-854.)

In *Levasseur* v. *State* (1970) 3 Tenn. Crim. 513 [464 S.W.2d 315] a husband and wife were convicted of selling marijuana. The wife testified that she did not participate in the sale of the marijuana. On appeal the wife claimed that the court erred in allowing the Attorney General to cross-examine her about a photograph. "In the picture she is depicted as processing the marijuana (pulling the leaves off the stems)." (*Id.,* at p. 319.)

Considering the plain dictionary definition of the verb "to process," the construction given that term by courts of sister states, and the well known principles of statutory construction that "if the words of a statute, when given their ordinary and popular meaning, are reasonably free of uncertainty, courts will look no further to ascertain the statute's meaning . . . [and] in construing a statute a word should not be given a forced and strained meaning contrary to its common understanding . . ." (*County of Orange* v. *Flournoy* (1974) 42 Cal.App.3d 908, 912 [117 Cal.Rptr. 224]), we conclude that one who removes the leaves from marijuana plants in order to render the leaves usable for smoking is engaged in processing the drug and thus violates the provisions of Health and Safety Code section 11358.

The judgment is affirmed.

Franson, Acting P. J., and Martin, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied May 2, 1985. Bird, C. J., and Reynoso, J., were of the opinion that the petition should be granted.