[No. F004776. Fifth Dist. June 27, 1986.]

THE PEOPLE, Plaintiff and Respondent, v.
ANTHONY EPPS, Defendant and Appellant.

**COUNSEL**

Frank O. Bell, Jr., State Public Defender, under appointment by the Court of Appeal, Antonia D. Radillo and Cynthia A. Thomas, Deputy State Public Defenders, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Eddie T. Keller and Gelacio L. Bayani, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

### HOOVER, J.*—

#### STATEMENT OF THE CASE

On January 31, 1984, an information was filed in the Tulare County Superior Court charging appellant with one count of murder, including special allegations. On April 30, 1984, a first amended information was filed charging appellant with commission of one count of murder (violation of Pen. Code, § 187, a felony), one count of residential robbery (violation of Pen. Code, § 213.5, a felony), and one count of burglary (violation of Pen. Code, § 459, a felony). The first amended information specially alleged that count 1 was committed while appellant was engaged in the commission of the crimes of robbery and burglary within the meaning of Penal Code section 190.2, subdivision (a)(17). The amended information alleged, with respect to each count, appellant's prior conviction of residential burglary within the meaning of Penal Code section 667, subdivision (a). Appellant pled not guilty to all counts and denied the special allegations. On May 25, 1984, appellant waived his right to trial by jury on all three counts and the allegations of special circumstances.

A court trial was held and ultimately the court rendered a decision finding defendant guilty on all three counts and finding the allegations of special circumstances to be true with respect to each count and found true the allegation of appellant's prior serious felony conviction.

Appellant was sentenced to state prison for the term of life without possibility of parole. Appellant was also sentenced to the aggravated term of six years on count 2, including a consecutive enhancement for the prior felony conviction (Pen. Code, § 667, subd. (a)) and the aggravated term of six years on count 3, including a five-year enhancement for the prior serious felony conviction. The sentences on counts 2 and 3 were imposed concurrently and stayed pending completion of the sentence imposed on count 1. Appellant was further sentenced to the term of eight months for the prior serious felony conviction and the sentence was ordered to run consecutive to the sentence imposed on count 1.

Appellant appeals both the decision and sentence.

#### THE FACTS

On November 17, 1983, in Porterville, Tulare County, California, Signe Feldman (Feldman), age 77, was killed in her home. Feldman's home was

---

*Assigned by the Chairperson of the Judicial Council.

completely ransacked and various items of property with little actual value were taken. Sheriff's units were dispatched to the area of the victim's residence by neighbors who had called to report glass breaking and a general ruckus in the area. Upon arriving, the first unit observed appellant lying on his back in the middle of the road, arms up and hands behind his head, in front of the victim's home. After the initial contact with appellant and an indication that appellant was going to be arrested for being under the influence of alcohol, appellant broke free of a deputy sheriff and ran away, discarding clothing which was later connected to the crime scene. Appellant was soon apprehended. At about the same time the obvious damage to the victim's home led to further investigation of what appeared to be a burglary and soon thereafter, a murder. The trial transcript details at some length the near total destruction of the victim's home and her brutal murder. Suffice to say here that, given the testimony surrounding the conspicuous way in which appellant destroyed the home (several people testified to hearing noises and seeing appellant in the home for up to two hours), the senseless murder of an elderly victim merely for property of insignificant value, and appellant's aberrant behavior generally, the question of appellant's thought processes is very significant.

After appellant's arrest, the investigating officer had the presence of mind to obtain two blood samples and a urine sample from appellant. The blood samples were obtained in the proper manner and one was "preserved" for analysis of specific qualitative content while the other merely secured for eventual typing and comparison with the blood of the victim and blood at the crime scene. The urine sample was obtained in a manner which would prove ultimately useless for any practical purpose in this case. Standard procedures for obtaining urine samples as evidence in driving under-the-influence cases call for the accused to void his bladder and wait 10 to 20 minutes before giving the actual sample to be analyzed. This procedure precludes the accumulation of metabolic waste which would give an inaccurate view of the ratio of alcohol or drugs in the blood at or near the time of the offense. In this case, the authorities failed to have appellant void his bladder prior to collecting a sample of appellant's urine. Analysis of the sample obtained was sufficient for qualitative analysis but deficient for quantitative analysis including any extrapolation to quantify the presence of intoxicants or controlled substances in appellant's blood.

During the ensuing investigation and shortly thereafter, officers learned from witnesses that appellant had been drinking, possibly heavily, and may have used drugs. It was also learned that appellant had been in a fight in a bar and had become involved in a discussion with a key witness, Virginia Macri (Macri), about a $20 debt owed by appellant to Macri. The evidence

established that appellant and several others had been at Macri's house the evening before and early morning hours of the murder. Macri's house is but a few houses away from the victim's home on the same street. After the discussion of the fact of appellant's debt of $20 to Macri, appellant and others left. Before leaving, Macri testified that appellant indicated he was "going to go to rob the lady down the street" to get Macri some money and that "somebody might get killed," and if someone was killed Macri had better not say anything. It was also learned that while the victim's grandson lived with her, appellant had been a frequent visitor to their home.

As earlier stated, several individuals, including Macri, heard loud noises coming from the victim's house. The noises continued for an extended period. Two witnesses, Macri and Monte Mitchell (Mitchell), testified to actually having seen appellant standing in an open window of the victim's home during the time the crime must have been occurring. Mitchell even provided testimony that the noise emanating from the house stopped during the times appellant seemed to be stationary, framed by the open window, staring outside.

Various items of personal property identified by relatives as belonging to the victim were found in a jacket shed by appellant during his attempted flight from the deputies. Shoe prints near the victim's home matched the soles of the shoes worn by appellant. Appellant's hands, as well as currency in his possession, were stained with blood which matched the blood type of the victim and was inconsistent with appellant's own blood type. In short, the physical evidence and eyewitness testimony overwhelmingly established appellant as the perpetrator of this brutal and senseless murder.

The defense sought through testimony of appellant, appellant's associates and medical experts to establish a pattern of chronic and contemporaneous drug and alcohol use which caused a blackout during the time in question and a mental state incapable of formulating specific intent.

While never disputing the fact that appellant had consumed alcohol and drugs immediately prior to the crime, the prosecution obviously did not concede the issue of intent. Therefore, the ability to present evidence with respect to the blood and/or urine analysis was of considerable importance to the appellant's position. But for the actions of the prosecution and its treatment of physical evidence critical to the defense of this case, affirmation of this judgment would be simple. This court nonetheless affirms the judgment by applying principles of federal law.

## I.

## Was Appellant Denied Due Process of Law by the State's Failure to Preserve Potentially Favorable Evidence and the Trial Court's Failure to Impose an Appropriate Sanction?

There has evolved in recent years a body of case law which has been described as creating a "'constitutionally guaranteed access to evidence.'" (*California* v. *Trombetta* (1984) 467 U.S. 479, 485 [81 L.Ed.2d 413, 419, 104 S.Ct. 2528, 2532].) There is probably no concise definition of this right and the courts, state and federal, have employed a case-by-case analysis. To elaborate the history and detail the many cases at this point would probably confuse rather than clarify the problem. Succinctly put, the inquiry is: "What duty does the state have in regard to the collection, retention, and distribution of evidence which might help the accused?" A natural corollary to this inquiry is: "What is the sanction which should be imposed on the state for violation of this duty?" At this point the court notes that there are many logical component parts to this puzzle. It is clear that the evidence involved may be human, in the form of witnesses, or inanimate, in the form of tangible physical evidence commonly associated with crime, i.e., blood, hair, tissue, semen, fingerprints, etc., etc. This opinion will only deal with inanimate physical evidence. It should be noted, however, that earlier opinions, such as *Brady* v. *Maryland* (1963) 373 U.S. 83 [10 L.Ed.2d 215, 83 S.Ct. 1194], had little trouble expanding due process considerations with facts which showed a deliberate prosecution act or omission resulting in exculpatory evidence being withheld from the accused.

In the area of the state's duty with respect to physical evidence potentially useful to the accused, the leading cases have dealt with blood alcohol levels obtained from the blood, breath or urine of accused drunk drivers. Fundamentally this court notes the difference between evidence which is the only evidence probative on the ultimate issue and the situation actually presented by this appeal.[1] While a gross examination of the constitutionally guaranteed right of access to evidence might indicate universal application, actually there are subtle distinctions in the application of the duty and the imposition of sanctions for violation of the right. Patterns have evolved, but it would be presumptuous for this court to attempt to articulate a "majority rule." It is clear, however, that fundamental considerations exist in different cases: (1) is the evidence objective evidence or subjective evidence; (2) does the evidence seized constitute the primary evidence of defendant's

---

[1]California Vehicle Code section 23152, subdivision (b) makes the simple act of driving with a blood alcohol level of .10 percent by weight or greater a crime per se. Certainly when the chemistry itself is the major component of the crime, the courts are correct in applying very high standards of care with respect to this evidence.

guilt or merely represent part of a possible defense; (3) what is the methodology of the state regarding the collection of the evidence and its retention; and (4) is the accused charged with specific intent or general intent crimes?

In the instant case there is no issue of whether the need for an independent defense analysis was apparent during the time frame in which these actions occurred. The investigating officer on the night of the murder concluded that blood and urine samples were necessary for testing given the obvious evidentiary considerations in the case. This is not a case of applying 20-20 hindsight to a patrol officer's conduct, concerning some esoteric application of a judicially created search and seizure rule, where the officer was faced with an instantaneous decision. In this case the officer's experience and education are obvious. The officer probably felt this was a case involving special circumstances, and the thought processes of appellant, if significantly impaired, would be of critical, perhaps singular, importance. The officer is to be commended on his recognition of the potential problem and his straightforward and proper conduct in obtaining blood and urine samples as evidence. It must have been obvious, even early in the investigation, that the evidence pointing to appellant as the perpetrator was overwhelming.

As it turns out, the officer was correct, and appellant's mental state was the pivotal issue.

Therefore, from the inception of this case, the blood and urine tests could not have had anything but momentous significance. It is noteworthy that the record from the date of filing the complaint (mid-November 1983) until January 1984 contains little reference to the problem presented. Defense counsel requested the blood and urine samples for independent testing and was repeatedly assured of their ultimate delivery. The record speaks well for what must be the honesty and professionalism of the law enforcement agencies in Tulare County and the state regional laboratories. In this case, however, defense counsel's reliance on a pattern of behavior was misplaced and occurred in such a manner that, absent the benefit of a crystal ball, could not have been avoided. By the time all the pieces fell into place, the blood sample suitable for qualitative and quantitative testing had been entirely consumed and it was apparent the urine sample was inappropriate for the desired testing.

 This case poses a predicament which is not easily reconciled, which is to say, the prosecution very easily could have prevented this calamity. On its first realization that the quantity of properly preserved blood was a problem, the prosecution could easily have informed defense counsel and sought either a mutually agreed upon independent laboratory, an alternate and scientifically sound procedure for testing two smaller-than-usual sam-

ples, or the guidance of the superior court in fashioning a discovery order. The prosecution did not deviate from its standard procedures for analysis of the blood sample. However, this standard procedure ultimately consumed the entire sample. It is possible that the prosecution did not ask and was not told of the gradual attrition of the blood sample. Perhaps the prosecution was negligent in failing to inquire as to the amount of blood actually needed for its standard tests and ignorant of the actual testing processes, including the eventuality of repeated testing. Because the practice and procedure in Tulare County seem to have a reputation in the community for integrity, and because appellant's trial counsel stated on the record, "Your Honor, I don't think its any deliberate act on Miss Paden's part," this court concludes that the trial court was correct in its ruling that the state was acting in good faith in following its normal procedures, and that there was no conscious effort to suppress evidence beneficial to the defense.

In deciding this case and mindful of the above, this court looks to the prevailing authority in this area. ■ As often cited in both sides' briefs and arguments, the case of *People* v. *Hitch* (1974) 12 Cal.3d 641 [117 Cal.Rptr. 9, 527 P.2d 361] represents this state's highest court's definitive statement of the duty to preserve blood samples obtained by the police in criminal investigations. The standard enumerated in *Hitch,* and expanded by its progeny, is (1) that the evidence must have been material, (2) the authorities must have had knowledge of the potential materiality of the evidence, and (3) the authorities must have destroyed the evidence or failed to follow "rigorous and systematic procedures" to preserve the evidence. (*People* v. *Hitch, supra,* 12 Cal.3d at pp. 652-653.)

The burden articulated in *Hitch* and imposed on the prosecution to establish, enforce and attempt in good faith to adhere to "rigorous and systematic procedures" designed to preserve the evidence has been applied to urine samples (*People* v. *Moore* (1983) 34 Cal.3d 215 [193 Cal.Rptr. 404, 666 P.2d 419]) and semen samples (*People* v. *Nation* (1980) 26 Cal.3d 169 [161 Cal.Rptr. 299, 604 P.2d 1051]). The test of materiality that appellant must preliminarily satisfy merely requires a showing that there is "'a reasonable possibility that the evidence, if preserved, would have constituted favorable evidence on the issue of guilt or innocence. [Citation omitted.]'" (*People* v. *Moore, supra,* 34 Cal.3d at p. 220; *People* v. *Hitch, supra,* 12 Cal.3d at p. 649; *People* v. *Newsome* (1982) 136 Cal.App.3d 992, 1001 [186 Cal.Rptr. 676].) The Supreme Court in *Moore* further went on to state that the burden of the defense is satisfied when the "evidence by its nature could reasonably be used to impeach the credibility of the prosecution witness' testimony regarding the evidence." (34 Cal.3d at p. 220.)

■ Appellant and respondent both cite the analogous federal rule as set forth in *California* v. *Trombetta, supra,* 467 U.S. at pages 488-489 [81

L.Ed.2d at p. 422, 104 S.Ct. at p. 2534]: "Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. [Fn. omitted.] To meet this standard of constitutional materiality, . . ., evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and also be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."

Both parties, at least impliedly, assume that either the *Hitch* standard is applicable or functionally identical to the federal standard and analyze the issue by applying both standards interchangeably. In appellant's view, the *Trombetta* test "incorporates the first two steps of the California analysis, stating them as a single requirement, and adds the requirement that the defendant have no reasonably available means to obtain equivalent evidence."

Neither party addresses the question of whether *Hitch or Trombetta* is the controlling law in California. It seems well settled that law enforcement agencies, prosecutors and courts have accepted the responsibility of safeguarding evidence from being lost to defense counsel. *Hitch* and its progeny have resulted in far greater care than ever before concerning the preservation of evidence. The real issue in these types of cases deals with the methodology of handling the evidence and sanctions, if any, to be imposed in cases where evidence is lost or made inaccessible. It is important to note here again that in the instant case defense counsel indicated and the court found that the loss of this evidence was not deliberate on the part of the prosecution.

Therefore, operating in an area where it is well settled and accepted that the state must at least reasonably attempt to safeguard evidence, we turn to an analysis of the controlling authority in situations such as this one where the evidence is lost or unavailable. ■ The application of *Hitch* or *Trombetta* is critical to the resolution of this case. The California Supreme Court has stated "[i]t is apparent that the *Trombetta* formulation of the duty-to-preserve test differs substantially from our own *Hitch* standard." (*In re Michael L.* (1985) 39 Cal.3d 81, 86 [216 Cal.Rptr. 140, 702 P.2d 222].) In *People* v. *Tierce* (1985) 165 Cal.App.3d 256, at pages 262-263 [211 Cal.Rptr. 325], this court concluded that the truth-in-evidence provision (Cal. Const., art. I, § 28, adopted by initiative, Primary Elec. (June 8, 1982) as Prop. 8) mandates that "the due process issue and the materiality issue in the case now before us must be decided by virtue of the application of principles of federal law" and *California* v. *Trombetta, supra,* becomes the guiding precedent. This court must carefully approach the task of reach-

ing the ultimate conclusion whether *Trombetta* is the applicable law. *Tierce* seems to apply, with a broad brush, Proposition 8 to *Hitch* when it states: "In view of the mandate of California Constitution, article I, section 28, subdivision (d), both the due process issue and the materiality issue in the case now before us must be decided by virtue of the application of principles of federal law." (*People* v. *Tierce, supra,* 165 Cal.App.3d at p. 263.) Two fundamental questions are posed by the reasoning in *Tierce:* (1) Are evidentiary rules of exclusion for violations of other than search and seizure provisions covered by Proposition 8, and (2) is *Hitch* decided on federal or state law?

The first question is far more complex than it initially appears. In *Tierce,* this court quoted from *In re Lance W.* (1985) 37 Cal.3d 873 [210 Cal.Rptr. 631, 694 P.2d 744]: "What Proposition 8 does is to eliminate a judicially created *remedy* for violations of the search and seizure provisions of the federal or state Constitutions, through the exclusion of evidence so obtained, except to the extent that exclusion remains federally compelled." (*In re Lance W., supra,* 37 Cal.3d at pp. 886-887.) It might therefore be argued that Proposition 8 only applies to search and seizure, or Fourth Amendment violations. It should be noted that *In re Lance W.* was a Fourth Amendment situation. *Hitch,* whether resting on state or federal grounds, involves due process and is not otherwise covered by a privilege or statute and thus seems exempt from Proposition 8. The question is how can *Hitch* be overruled by Proposition 8 as stated in *Tierce.* The answer can be found by careful consideration of the language of Proposition 8, the language in *In re Lance W.,* and the language in other recent decisions. The net effect of this analysis leads this court to conclude that the applicability of Proposition 8 can be stated as follows:

Whenever the *remedy* for the violation of a federal constitutional right, regardless of whether it is search and seizure, due process, right to confrontation, etc., is not covered by a California statutory scheme such as privilege, and involves the *exclusion* of evidence, Proposition 8 requires the court to apply federal judicial standards.

This conclusion is drawn from the express language of Proposition 8, which states: "Except as provided by statute hereafter enacted . . . relevant evidence shall not be excluded in any criminal proceeding . . . ." (Cal. Const., art. I, § 28, subd. (d).)

Also, despite the fact that *In re Lance W.* states the applicability of Proposition 8 to "search and seizure" violations, the California Supreme Court has indicated in subsequent opinions that Proposition 8 also applies to cases involving other than search and seizure violations.

A footnote in *In re Lance W.* itself states "[t]he question of whether section 28(d) mandates admission of evidence obtained in violation of other constitutional guarantees is not presented by this appeal and we do not, therefore, address amicus' further assertion that evidence obtained in violation of a defendant's Sixth Amendment right to counsel must be admitted under the mandate of section 28(d)." (*In re Lance W., supra,* 37 Cal.3d at p. 885, fn. 4.)

*People* v. *Weaver* (1985) 39 Cal.3d 654, 659 [217 Cal.Rptr. 245, 703 P.2d 1139] concluded the exclusionary remedy adopted in *People* v. *Coleman* (1975) 13 Cal.3d 867 [120 Cal.Rptr. 384, 533 P.2d 1024], which establishes use immunity in a subsequent trial on criminal charges for the testimony of a probationer given at a probation revocation hearing, "survived Proposition 8 because that remedy falls within the exception to section 28, subdivision (d), which preserves preexisting statutory privileges." (39 Cal.3d at pp. 656-657.) Thus the court in *Weaver* implicitly found that Proposition 8 was applicable to a state exclusionary remedy for violation of a constitutional provision other than search and seizure, but concluded that an express exception stated in the initiative saved the exclusionary rule in this case.

Therefore, *Tierce* is correct in its conclusion that Proposition 8 compels an application of federal rules, and in cases involving this "constitutional guarantee of access to evidence" resolves that *Trombetta* is the relevant standard. Resolution of the question of whether *Hitch* is founded in state or federal law may not be necessary since Proposition 8 seems to compel application of federal principles in either event. Since some confusion remains in the area, we will deal briefly with this aspect of the case. *Hitch* was decided in 1973 by a nearly unanimous California Supreme Court. The only dissent came from Justice Mosk who wrote of the essential unfairness of the effect of the ruling which concluded that due process was in fact violated but applied the rule prospectively. *Hitch* was decided on due process grounds, incorporates federal standards, and cites federal cases as authority.

After *Hitch* there was a proliferation of California cases which expanded the concept of a "constitutionally guaranteed access to evidence." Certainly the spread of the reasoning announced in *Hitch* has found a broader footing in California than in the federal courts. The idea that *Hitch* was based on independent state grounds, as stated by this court in *Tierce* (165 Cal.App.3d at p. 263), is agreed with by Chief Justice Bird, who, dissenting in *In re Michael L., supra,* 39 Cal.3d 81, at page 101, stated: "I believe it necessary to emphasize that the duty-to-preserve principles announced in *Hitch* rest on independent state grounds."

However, the by-the-court opinion in *Michael L.* concludes that "[i]n *Hitch,* we held that the *federal*-guaranty of due process requires the People to *preserve* breathalyzer ampoules in their possession for later retesting by defendants charged with driving while intoxicated." (*In re Michael L.,* *supra,* 39 Cal.3d at pp. 85-86, first italics added.)

Likewise, in a very recent appellate court decision, the Fourth District stated: "Although we frankly prefer the more practical *Hitch* formulation, *Hitch* and its progeny have always been grounded solely on the federal due process guaranty. And in *Trombetta* the United States Supreme Court arrived at a different result on virtually identical facts. Under the circumstances we must, of course, follow the *Trombetta* rule." (*People* v. *Gonzales* (1986) 179 Cal.App.3d 566, 572 [224 Cal.Rptr. 853].)

Although not squarely addressed by the parties in this litigation, the trial court was not asked to *exclude* evidence as a remedy and therefore Proposition 8 may not apply to this case at all. It seems obvious that the proponents of and the voters who supported the truth-in-evidence provision of Proposition 8 were concerned with defendants who were actually guilty but could not be convicted because of the judicially created remedy of excluding otherwise relevant evidence. In the case before this court, appellant wanted *more* evidence to be available. It is doubtful that the citizens of this state would ever support a constitutional amendment limiting the ability of an accused to present relevant and admissible evidence of his innocence.

By this analysis it can be argued that Proposition 8 does not address this area of constitutionally guaranteed access to evidence except in those cases where the court, in fashioning a remedy, considers exclusion of evidence. Here the court was never faced with a request to exclude evidence but was asked to dismiss the case or, in the alternative, to dismiss all specific intent crimes. As previously discussed, the "trigger" to Proposition 8 occurs when exclusion of evidence is considered as a remedy. We find that, in cases such as this, where the evidence allegedly lost or destroyed is potentially ex-culpatory, and the usual remedy is exclusion of evidence potentially incul-patory, the functional remedial equivalent of exclusion of evidence is dismissal or dismissal of specific intent crimes.

Notwithstanding the above, we have now concluded that *Hitch* is founded on federal law. It is well established that *Trombetta,* a subsequent federal decision, is the current version of the standard regarding access to evidence. (Cf. *People* v. *Gonzales, supra,* 179 Cal.App.3d 566.)

*Trombetta* articulated a more tolerant standard than *Hitch.* The essential difference between the two cases is that *Hitch* adopts a relatively neutral

attitude toward the materiality of the evidence (i.e., (1) did it exist and (2) is it possible that the evidence could have benefitted the accused). (*People v. Hitch, supra,* 12 Cal.3d at p. 649.) *Trombetta,* on the other hand, imposes a significantly different test of materiality—"evidence must . . . possess an exculpatory value that was apparent before the evidence was destroyed . . ." (*California v. Trombetta, supra,* 467 U.S. at p. 489 [81 L.Ed.2d at p. 422, 104 S.Ct. at p. 2534])—while remaining neutral on the issue of the duty to preserve evidence, preferring instead to rely on prior decisions of the Supreme Court.

It should be noted that in two recent decisions the Second District has summarily dismissed the contention that *Trombetta* displaced *Hitch* as the controlling authority in California.

In *People* v. *Roehler* (1985) 167 Cal.App.3d 353 [213 Cal.Rptr. 353], a second autopsy was performed on the defendant's wife and child after a tip to the police suggested that they had not drowned accidentally as earlier believed. The defendant objected, claiming that *Hitch* required preservation of the bodies for subsequent defense analysis. In rejecting this claim the court considered both the separate jurisdictional authority of coroners to examine accidental deaths and dispose of bodies, and the considerable historical, social and religious implications of retaining corpses as evidence. (167 Cal.App.3d at pp. 372-381.) The court, however, rejected *Trombetta* as controlling, reasoning that the federal rules pertaining to preservation of evidence have not been fully addressed. (167 Cal.App.3d at p. 383.) We agree that the duty and methodology to preserve evidence were not definitively stated in *Trombetta,* but the *Trombetta* test of materiality has been clearly stated and does apply to these cases.

Likewise, in *People* v. *Lawrence* (1985) 172 Cal.App.3d 1069 [218 Cal.Rptr. 345], the Second District held *Trombetta* not controlling on the issue of the duty to preserve. In that case a murder suspect turned herself in after 11 years of hiding. The ballistics reports on the weapon used and bullets recovered from the victim's body were available and admitted. However, the actual bullets themselves had been lost or misplaced. The court affirmed the conviction and concluded that the "defendant is solely to blame for the long delay in her trial, [and] the application of sanctions would be inappropriate and a miscarriage of justice." (172 Cal.App.3d at p. 1078.) The court, however, in dealing with the issue of preservation of the bullets, considered the problem of the application of *Hitch* or *Trombetta.* The court followed the reasoning of *Roehler* and determined that "'the problem of developing rules about preservation of evidence has yet to be fully addressed on the *federal* level.'" (172 Cal.App.3d at p. 1077.) Following this determination, the court in *Lawrence* then applied the *Hitch* standard of mate-

riality. (*Ibid.*) We disagree with the ability to apply *Hitch* to the materiality analysis of lost or unavailable evidence. Having concluded that *Hitch* is founded on federal principles, it must follow that *Trombetta* is the law. While we agree that *Trombetta* leaves open the duty to preserve and the analysis of methods employed by the state in doing so, the standard for considering materiality has certainly been decided. The standard of materiality is *Trombetta,* not *Hitch.*

■ Here the blood and urine obtained from appellant, insofar as indicative of appellant's use of alcohol and drugs at or near the time of the murder, cannot, obviously, be obtained again. This point is conceded. In considering this case it is clear that, while not available to appellant, the evidence was at least analyzed using proper scientific methodology and those results were admitted into evidence. This is not the hopeless situation faced by the defendant in *People* v. *Nation, supra,* 26 Cal.3d 169 where a semen sample was not preserved properly for blood typing after it had been extracted from the region of the victim's vagina.[2] Nor is it the situation in *People* v. *Mejia* (1976) 57 Cal.App.3d 574 [129 Cal.Rptr. 192] where eyewitnesses were deported out of the country.

In the instant case the evidence was in fact analyzed, the results were helpful to appellant, and it is quite apparent that the trial court gave at least as much weight to the defense witnesses' extrapolation of the results of analysis as would likely have been possible given an adequate sample for retesting. Quite simply put, appellant got as much mileage out of the evidence of alcohol/drug influence as he could reasonably have expected, no matter how many experts analyzed the evidence.

The blood alcohol analysis showed a level of .16 at the time of the test. The defense expert opined that errors in testing could indicate an actual level of .22 at the time of the test. By backtracking the burnoff to the time of the crime, defense experts estimated the blood alcohol could have been slightly over .30. The trial judge, hearing both prosecution and defense evidence, indicated he found a blood alcohol level of .27 or .28, which is a relatively high blood alcohol level. Had enough of the blood sample been retained to permit retesting by appellant, it is theoretically possible the defense *might* have established that appellant was unconscious, or even comatose, at the time of the crime. The evidence presented, however, clearly

---

[2] In *Nation,* the defendant was convicted of lewd and lascivious conduct on a child under 14 while armed with a firearm. The sole issue was identification. The identification had been accomplished using a mugshot of defendant which the police had left in the possession of the victim and other witnesses for one week. A vaginal smear from the victim was analyzed only for the presence of sperm but never typed and compared with the defendant's blood type.

showed appellant consciously doing the physical acts which resulted in the murder and the destruction of the victim's home. None of the defense experts indicated that any particular blood alcohol or blood amphetamine level would produce nonintentional acts. The experts suggested appellant could well have been suffering from a "blackout" or "greyout," but it is important to note that this opinion would have been the same regardless of any differences in blood/drug alcohol levels, assuming any error indicated a lower blood/drug alcohol level. In short, absent testimony that appellant could not have committed the acts due to unconsciousness or loss of motor ability, the levels indicated by the prosecution examination afforded appellant the essential evidence he needed to present his case. It is obvious that the trial court considered that appellant's blood alcohol level was very high and also that evidence indicated that the blood amphetamine level, while still within therapeutic levels, was also very high. Mindful of the origins of this area of law, this court cannot find that the errors complained of herein resulted in a denial of due process.

## II.

### Does the Felony-murder Special Circumstance Require a Finding That the Appellant Committed a Premeditated and Deliberate Murder as Well as an Intentional Murder?

 Appellant contends that the trial court erred in imposing a sentence of life in prison without possibility of parole (LWOP), based on its finding of special circumstances pursuant to Penal Code section 190.2, subdivision (a)(17). Appellant's argument is based on two elements: (1) The punishment of LWOP is constitutionally infirm unless, in addition to a finding that the killing was intentional, it is determined that the murder was willful, deliberate and premeditated, and (2) Penal Code section 190.2, subdivision (a)(17) may properly be given a construction which necessarily incorporates the requirement that the murder be willful, deliberate and premeditated.

 Turning first to appellant's latter argument, we begin with an examination of the applicable statutory provisions. Penal Code section 190.2, subdivision (a)(17), adopted pursuant to the Briggs Initiative Measure approved November 7, 1978, provides that the penalty for the defendant convicted of murder in the first degree shall be death or LWOP in any case where the "murder was committed while the defendant was engaged in or was an accomplice in the commission of, attempted commission of, or the immediate flight after committing or attempting to commit the following felonies:

"(i) Robbery in violation of Section 211.

"(ii) Kidnapping in violation of Sections 207 and 209.

"(iii) Rape in violation of Section 261.

"(iv) Sodomy in violation of Section 286.

"(v) The performance of a lewd or lascivious act upon the person of a child under the age of 14 in violation of Section 288.

"(vi) Oral copulation in violation of Section 288a.

"(vii) Burglary in the first or second degree in violation of Section 460.

"(viii) Arson in violation of Section 447.

"(ix) Train wrecking in violation of Section 219."

The former version of Penal Code section 190.2 which was repealed by the Briggs Initiative provided, in pertinent part: "The penalty for a defendant found guilty of murder in the first degree shall be death or confinement in the state prison for life without possibility of parole in any case in which one or more of the following special circumstances has been charged and specially found,

". . . . . . . . . . . . . . . . . . . . . . . . .

"(c) The defendant was personally present during the commission of the act or acts causing death, and with intent to cause death physically aided or committed such act or acts causing death and any of the following additional circumstances exists:

". . . . . . . . . . . . . . . . . . . . . . . . .

"(3) The murder was willful, deliberate, and premeditated and was committed during the commission or attempted commission of any of the following crimes:

"(i) Robbery in violation of Section 211;

"(ii) Kidnapping in violation of Section 207 or 209. Brief movements of a victim which are merely incidental to the commission of another offense and which do not substantially increase the victim's risk of harm over that necessarily inherent in the other offense do not constitute a violation of Section 209 within the meaning of this paragraph.

"(iii) Rape by force or violence in violation of subdivision (2) of Section 261; or by threat of great and immediate bodily harm in violation of subdivision (3) of Section 261;

"(iv) The performance of a lewd or lascivious act upon the person of a child under the age of 14 years in violation of Section 288;

"(v) Burglary in violation of subdivision (1) of Section 460 of an inhabited dwelling house with an intent to commit grand or petit larceny or rape."

On its face, the present version of Penal Code section 190.2, subdivision (a)(17) obviously contains no requirement that the death penalty or LWOP be imposed only for intentional, premeditated and deliberate murders. The California Supreme Court has subsequently held that proof of intent to kill was essential to a finding of felony-murder special circumstances under the 1978 death penalty initiative. (*Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862]; *People* v. *Boyd* (1985) 38 Cal.3d 762 [215 Cal.Rptr. 1, 700 P.2d 782].) Appellant suggests that we hold likewise with respect to the elements of premeditation and deliberation, consistent with the prior death penalty law.

Appellant contends the Briggs Initiative omitted the "willful, deliberate, and premeditated" language of the former death penalty statute in order to invoke the punishment of death or LWOP. Appellant then argues, however, that there is nothing in the legislative history of the Briggs Initiative to suggest the omission was for the "purpose of eliminating the requirement that a capital felony murder be premeditated." It is difficult to understand the logic of appellant in this regard. ■ We are bound by the rule of construction that presumes the Legislature "by deleting an express provision of a statute intended a substantial change in the law." (*People* v. *Valentine* (1946) 28 Cal.2d 121, 142 [169 P.2d 1]; *People* v. *Dillon* (1983) 34 Cal.3d 441, 467 [194 Cal.Rptr. 390, 668 P.2d 697].)

■ Both appellant and respondent agree that the purpose of the Briggs Initiative was to "expand the circumstances under which the death penalty or the punishment of life without possibility of parole could be meted out."

Appellant relies on the arguments in favor of the Briggs Initiative as set forth in the voter's pamphlet (pamphlet) distributed to the electorate in 1978: "Proposition 7 would also apply to the killer of a judge, a prosecutor, or a fireman. It would apply to a killer who murders a citizen in cold blood because of his race or religion or nationality. And, it would apply to all situations which are covered by our current death penalty law." (Ballot Pamp., Gen. Elec., Nov. 7, 1978, p. 34.) Appellant contends that the foregoing suggests that the statute was intended to apply to all special circumstance situations covered by the prior death penalty law. The Briggs Initiative does apply to the same special circumstance situations covered by prior law. However, the initiative specifically omitted the preliminary re-

quirement that the killing be accompanied by premeditation and deliberation.

The general thrust of the Briggs Initiative is to expand the application of California's death penalty. The most reasonable interpretation of the intent of the Briggs Initiative is that it specifically deleted the requirement that felony murder be premeditated and deliberate in order to greatly expand application of the death penalty in California. This view is supported by the California Attorney General's summary of the Briggs Initiative and the California Legislative Analyst's Review of the Briggs Initiative. (Ballot Pamp., *supra,* p. 32.)

Appellant argues that because the Supreme Court read into the Briggs Initiative the requirement that the defendant must possess an intent to kill under the felony-murder special circumstance, the same conclusion must be reached with respect to the question of the defendant's deliberation and premeditation. In *Carlos,* the Supreme Court concluded that the new death penalty law retained the requirement of the defendant's intent to kill for several reasons. Foremost among those reasons was its determination that a construction of paragraph 17 of section 190.2 without an intent requirement would have anomalous results: "Five of the felonies listed in that paragraph—arson, rape, robbery, burglary and child molesting—also appear in section 189, the statutory felony-murder provision. [Fn. omitted.] As to these offenses, an unintentional killing in perpetration of the felony, raised to first degree murder by operation of section 189, would without further proof constitute a special circumstance under paragraph 17. The remaining four felonies—kidnaping, sodomy, oral copulation, and train wrecking— are not enumerated in section 189. Since it is clear that in virtually every case an intent to kill would be required to render a death occurring in the course of one of these four felonies a first degree murder—a prerequisite to any special circumstance finding (§ 190.2, subd. (a))—a defendant who kills unintentionally during the commission of those offenses is not subject to the death penalty or imprisonment without possibility of parole. [Fn. omitted.]

"There is, however, no reason to believe that the drafters or voters intended to distinguish between deaths which occurred during the course of section 189 felonies and those in nonsection 189 felonies; the two classes of felonies are interspersed randomly in paragraph 17. And the result of such a distinction would be difficult to defend. A defendant who killed unintentionally during a robbery or rape could be convicted of first degree murder with special circumstances and executed, while one who killed unintentionally during a kidnaping for robbery or a forcible sodomy could not be convicted

of first degree murder and thus could not be executed." (35 Cal.3d at pp. 140-141.)[3]

Extrapolating from the foregoing in *Carlos,* appellant argues that failure to construe section 190.2, subdivision (a)(17), to contain the requirement that the homicide be deliberate and premeditated would similarly lead to an anomalous result in its application. In other words, appellant contends that application of the special circumstance rule to those felonies not enumerated in Penal Code section 189 (defining first degree murder) would require a determination of premeditation and deliberation in order to satisfy the requirement of section 190.2, subdivision (a), that the murder be of the first degree. On the other hand, a homicide during the commission of any of the other felonies in section 190.2, subdivision (a)(17), which are also enumerated in Penal Code section 189 would be appropriate without a determination of the defendant's premeditation and deliberation.

Ordinary first degree murder, which requires premeditation and deliberation with malice aforethought, and felony murder are not the same crimes because malice is not an element of felony murder. (See *People* v. *Dillon, supra,* 34 Cal.3d at pp. 476-477.) Nevertheless, appellant argues that failure to construe the statute in question to require the factors of premeditation and deliberation in all cases would violate a basic principle of statutory construction: "that a statute should be construed so that the scope and meaning of statutory language remains the same in different parts or portions of the same law." However, the authorities relied upon by appellant merely stand for the proposition that "when a word or phrase has been given a particular scope or meaning in one part or portion of a law it shall be given the same scope and meaning in other parts or portions of the law." (*Stillwell* v. *State Bar* (1946) 29 Cal.2d 119, 123 [173 P.2d 313]; *People* v. *McCart* (1982) 32 Cal.3d at pp. 338, 344 [185 Cal.Rptr. 284, 649 P.2d 926].) In appellant's view, if the first degree murder requirement of subdivision (a) of section 190.2 imposes the requirement that premeditation and deliberation must be established to find first degree murder independent of the felony-murder rule as to certain of the felonies listed in paragraph 17, then the same requirement must be applicable to the other felonies listed in paragraph 17. Were this argument the only basis of the Supreme Court's decision in *Carlos,* it would be very difficult to argue that the same principle does not apply to the elements of premeditation and

---

[3]The *Carlos* court also relied heavily on the rebuttal by proponents of the Briggs Initiative to opposition charges that Proposition 7 could be construed to impose the death penalty for an unintended killing. (35 Cal.3d at p. 144.) Construing the language of that rebuttal to convey the message to the voters that the initiative retained the requirement of an intent to kill, the *Carlos* court was able to evaluate the intent of the framers of the initiative as well as the electorate. (35 Cal.3d at pp. 144-145.)

deliberation. But the Supreme Court in *Carlos* relied on other arguments, including the fact that the voter pamphlet suggested to the electorate that no one could be executed or sentenced to life in prison without possibility of parole unless they intended to kill. A review of the initiative and the arguments in support or opposition thereto reasonably leads to the conclusion that the electorate expected that a defendant would have to be found to have intended to kill, as the court in *Carlos* concluded; a similar conclusion that the electorate assumed that the premeditation and deliberation requirement would remain is unreasonable. This view is reenforced by the fact that the initiative explicitly deleted any reference to premeditation or deliberation in the law brought before the people for their approval.

Proposition 7 explicitly deleted the premeditation and deliberation requirement and this deletion was not challenged before the electorate. Unlike the situation in *Carlos*, there is no other basis to conclude that the electorate intended to retain this requirement.

■■■ To the extent appellant attempts to challenge on constitutional grounds, the argument is without merit. Appellant relies on several decisions of the United States Supreme Court which, as appellant concedes, are capital cases.

A review of the pertinent portion of California's death penalty statute reveals detailed and objective descriptions of the specific circumstances under which the death penalty may be imposed in California. None of the guidelines set forth in Penal Code section 190.2 are under attack as vague or ambiguous. Rather, appellant merely contends that this court should read into the statute an additional term which would have the effect of limiting the circumstances under which the death penalty may be imposed, contrary to the express intent of the electorate to enlarge the number of cases in which the death penalty may be imposed. Imposition of the death penalty pursuant to California's death penalty law on a defendant who has intentionally and unlawfully killed another human being is not subject to constitutional nullification provided the discretion of the sentencing authority is governed by "'clear and objective standards.'" (*Godfrey v. Georgia* (1980) 446 U.S. 420, 428 [64 L.Ed.2d 398, 406, 100 S.Ct. 1759].) The statute in question herein is not attacked for failure to satisfy this requirement. There is no authority to support appellant's implicit contention that the death penalty is always inappropriate unless the defendant committed a premeditated and deliberate as well as intentional homicide.

In any event, it cannot be concluded that the statute is unconstitutional as applied to appellant because appellant was not sentenced to die. Appellant was sentenced to the term of LWOP. Appellant has cited no authority which

supports the proposition that the penalty of life in prison without possibility of parole is disproportionate to the crime of first degree felony murder where the killing was intentional.

The judgment is affirmed.

Franson, Acting P. J., and Martin, J., concurred.

A petition for a rehearing was denied July 24, 1986, and appellant's petition for review by the Supreme Court was denied October 16, 1986.