[No. F011928. Fifth Dist. Mar. 9, 1990.]

THE PEOPLE, Plaintiff and Appellant, v.
JOSE F. VALENCIA, Defendant and Respondent.

**COUNSEL**

John K. Van de Kamp, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Roger E. Venturi and Maureen A. Daly, Deputy Attorneys General, for Plaintiff and Appellant.

Jesse Cordova, under appointment by the Court of Appeal, for Defendant and Respondent.

**OPINION**

**BAXTER, J.—**

### INTRODUCTION

We are called upon to determine whether state or federal standards of materiality apply to the loss of testimonial evidence through an alien

witness's deportation. We will conclude that the state standard set forth in *People* v. *Mejia* (1976) 57 Cal.App.3d 574 [129 Cal.Rptr. 192] was abrogated by Proposition 8, and the federal standard contained in *United States* v. *Valenzuela-Bernal* (1981) 458 U.S. 858 [73 L.Ed.2d 1193, 102 S.Ct. 3440] controls.

## FACTS AND PROCEEDINGS BELOW

On December 29, 1988, police officers executed a search warrant at 902 Collins Way, apartment B, in Bakersfield. The warrant was issued based on suspicion of narcotics sales occurring at the apartment, and listed two suspects known as "Beto" and "Juaro." Officers Peter Cavazos and Lori Hashim knocked on the door and announced their presence in English and Spanish. No one answered, and the officers forced their way into the apartment. Benjamin Alcala, a 17-year-old Mexican national, was on the living room sofa, and respondent Jose F. Valencia was on the bed in the northeast bedroom.

A search of the northeast bedroom produced five baggies containing 7.24 grams of cocaine. The baggies were in the inside pocket of a men's blazer. The blazer was hanging in the bedroom closet amidst "quite a bit" of men's clothing. A loaded .25 caliber semiautomatic pistol was on top of the bedroom dresser. It was later determined that the gun had been reported stolen in January 1987. The officers also discovered bankbooks in the name of Henrietta Hughes in the same dresser. They were stolen from Hughes in March 1988.

Respondent was informed of his *Miranda* rights and agreed to speak with the officers. He had been living at the apartment for one month and occupied the northeast bedroom. He shared the apartment with Ricardo Avila, Alberto Alcala, and Benjamin Alcala. Avila returned to Mexico three days before the search. Respondent stated that the personal possessions in the northeast bedroom, including the blazer containing cocaine, belonged to Avila. Respondent had almost $1,000 in his wallet and explained that he saved part of the money from working in the fields and had recently borrowed $350 from a friend. When asked about the bankbooks, respondent said that he found them in the street. He tried to return them to the owner, but it appeared that no one was living at the address indicated, so he kept them. He claimed to be unaware of any narcotics sales from the apartment and of the cocaine in the blazer.

Benjamin Alcala also agreed to speak with the officers. Alcala lived in the apartment for approximately one month. His brother, Alberto Alcala, also lived there, but 15 days before the search Alberto had left for Mexico to

visit their parents. Alberto left his Chevrolet Camero automobile in the apartment parking lot and Benjamin was using it while Alberto was away. Benjamin stayed in the southeast bedroom, and the clothes in that closet belonged to him. Ricardo Avila was already living in the apartment when Benjamin moved in. Benjamin also said that Avila returned to Mexico three days before the search. The officers' report of the search and arrests provides: "Alcala stated there were a lot of people visiting Valencia at the apartment, but he did not know what the visits were about and had no knowledge of narcotics dealing from the apartment. He was asked about the firearm that was located and he stated it belonged to Avila."

Respondent and Alcala were arrested for possessing narcotics for sale. Alcala was booked at juvenile hall. He was deported to Mexico on January 4, 1989, without prior notice to respondent or his counsel.

On January 17, 1989, a preliminary hearing was held on the charges against respondent. Officer Cavazos testified that based on his experience, the cocaine in the blazer was possessed for the purpose of sale. This opinion was based on the amount of cocaine found in the apartment. It was also based on the stolen property found in the apartment since that property could have been exchanged for cocaine. Officer Hashim testified that respondent's possession of $1,000 was consistent with money received from narcotics sales. The court requested that respondent try on the blazer and noted that "the coat appears to fit the defendant." Respondent was held to answer on all charges.

On January 31, 1989, an information was filed in Kern County Superior Court charging respondent with the following counts: count I, possession of cocaine for sale (Health & Saf. Code, § 11351), with an enhancement for being armed with a firearm in the course of the offense (Pen. Code, § 12022, subd. (a)); and count II, possession of stolen property (Pen. Code, § 496, subd. 1), with the firearm enhancement.

On February 1, 1989, respondent was arraigned in superior court, pleaded not guilty to both counts, and denied the enhancements.

On February 21, 1989, respondent filed a motion to dismiss the charges pursuant to *People* v. *Mejia, supra,* 57 Cal.App.3d 574, and maintained that Benjamin Alcala's deportation violated his constitutional right to due process under the state's materiality standard. Appellant opposed the motion and urged the court to apply the federal standard of materiality in *California* v. *Trombetta* (1984) 467 U.S. 479 [81 L.Ed.2d 413, 104 S.Ct. 2528], recently adopted in a witness deportation case by the Fourth District in *People* v. *Lopez* (1988) 198 Cal.App.3d 135 [243 Cal.Rptr. 590]. The court

took the motion under submission and agreed to review the preliminary hearing transcript and the police report of December 29, 1988, in reaching a decision.

On March 2, 1989, the court issued the following minute order without expressly disclosing the standard utilized: "It appears to the Court that Acala [*sic*] is a material witness as to Count 1 and the armed clause and could be exculpatory. If the people cannot produce him by 3-10-89 at the time of readiness, Count 1 and the armed clause are ORDERED dismissed."

On March 10, 1989, appellant indicated that it could not produce Alcala, and the court dismissed count I and the enhancements. Appellant said it would not proceed solely on count II, and that count was also dismissed by the court. Respondent was ordered released from custody.

On March 22, 1989, appellant filed a timely notice of appeal of the dismissal (Pen. Code, § 1238, subd. (a)).

DISCUSSION

I.

DOES THE FEDERAL STANDARD CONTROL THE DETERMINATION OF
CONSTITUTIONAL MATERIALITY OF A DEPORTED WITNESS?

Appellant contends that *Mejia*'s state standard of materiality is no longer valid after passage of Proposition 8 and that *California* v. *Trombetta, supra*, 467 U.S. 479 contains the correct federal standard for deported witnesses. To evaluate these arguments, we shall (1) review *Mejia* and its progeny, (2) analyze the potential effect of Proposition 8 on *Mejia* and related evidentiary doctrines, and (3) select the appropriate federal standard to determine the constitutional materiality of deported witnesses.

A. *The State Standard of Materiality.*

*People* v. *Mejia, supra*, 57 Cal.App.3d 574, established the state's standard in determining whether a deported witness's testimony was of constitutional materiality. Mejia's probation officer acted on a tip that he was selling narcotics from his house. A search of the house revealed 130 kilos of marijuana. Mejia and several other occupants of the house were arrested, including two Mexican nationals. Charges against the two illegal aliens were dropped, and they were turned over to immigration authorities for deportation almost immediately after their arrests. Mejia moved to compel production of the two men as material witnesses, or to dismiss the case. The

People had released the men to federal authorities without notifying Mejia or making arrangements to delay the deportation pending trial.

The court held that state action had resulted in the unavailability of the two men to the defense. " 'The fundamental due process principle . . . is that the prosecution may not deprive an accused of the *opportunity* to present material evidence which might prove his innocence. Even if the prosecution's motives are "praiseworthy," they cannot prevail when they *"inevitably* result, intentionally or unintentionally, in depriving the defendant of a fair trial." [Citation.]' " (57 Cal.App.3d at pp. 579-580.) While the prosecution may select witnesses to use against a defendant, "[t]hey are not, . . . under principles of basic fairness, privileged to control the proceedings by choosing which material witnesses shall, and which shall not, be available to the accused in presenting his defense." (*Id.* at p. 580.)

The court promulgated the following standard for determining the constitutional materiality of an unavailable witness: "When a defendant asserts that state action has made a material witness unavailable, the requirement of materiality is the same as when he seeks the disclosure of an unidentified informer. It is the *material character of the witness,* not of the testimony, which must be demonstrated. Any specific showing of the testimony is made impossible by the unavailability of the witness [citation]. When the evidence discloses the person unavailable either participated in the crime charged, or was a nonparticipating eyewitness to the offense, in a position to perceive what took place from a sufficiently proximate vantage point, such person is a material witness, and the defendant has demonstrated a reasonable possibility he could, if available, give evidence which would exonerate him [citation]." (57 Cal.App.3d at p. 580.)

The court found that state action initiated and was partially responsible for the unavailability of these two witnesses since they were arrested by state authorities for violation of state law. State authorities decided not to press charges and turned them over to federal officials with the knowledge that they would be deported. (57 Cal.App.3d at p. 581.) The state's failure to provide Mejia the opportunity to interview the witnesses or place them under subpoena denied him a fair trial. (*Id.* at p. 582.)

The United States Supreme Court addressed the issue of deportation of witnesses in *United States* v. *Valenzuela-Bernal, supra,* 458 U.S. 858, and established a different standard. The right to compulsory process, guaranteed by the Sixth Amendment, does not grant a criminal defendant the right to secure the attendance and testimony of all witnesses, but "guarantees him 'compulsory process for obtaining *witnesses in his favor.* ' " (*Id.* at p. 867 [73 L.Ed.2d at p. 1202], italics in original.) The court reviewed "what might

loosely be called the area of constitutionally guaranteed access to evidence" in cases involving suppression of evidence favorable to the defendant and delayed indictments resulting in loss of evidence. These cases emphasized the requirement of materiality before evaluating the resulting prejudice from loss of the evidence. (*Id.* at p. 869 [73 L.Ed.2d at p. 1204].) The court drew a distinction, however, between the cases involving demonstrative evidence and illegal-alien witnesses: "The principal difference between these cases in related areas of the law and the present case is that respondent simply had no access to the witnesses who were deported after he was criminally charged." (*Id.* at p. 870 [73 L.Ed.2d at p. 1204].) Deportation eliminates the opportunity for the defendant to interview the witness to determine what favorable information they possessed. While such a difference may support "relaxation of the specificity required" in showing materiality, it does not justify the elimination of such a showing. (*Ibid.*)

The prompt deportation of illegal alien witnesses does not establish a violation of the compulsory process clause of the Sixth Amendment or the due process clause of the Fifth Amendment, unless there is some showing that the "evidence lost would be both material and favorable to the defense." (458 U.S. at p. 873 [73 L.Ed.2d at p. 1206].) The defendant, however, cannot be expected to render a detailed description of the lost testimony since prompt deportation eliminated the opportunity to interview the witness, but this difficulty does not eliminate the duty to make "some showing" of materiality. (*Ibid.*) "Sanctions may be imposed on the Government for deporting witnesses only if the criminal defendant makes a plausible showing that the testimony of the deported witnesses would have been material and favorable to his defense, in ways not merely cumulative to the testimony of available witnesses. In some cases such a showing may be based upon agreed facts, and will be in the nature of a legal argument rather than a submission of additional facts. In other cases the criminal defendant may advance additional facts, . . . with a view to persuading the court that the testimony of a deported witness would have been material and favorable to his defense." (458 U.S. at p. 873 [73 L.Ed.2d at p. 1206].)

"As in other cases concerning the loss of material evidence, sanctions will be warranted for deportation of alien witnesses only if there is a reasonable likelihood that the testimony could have affected the judgment of the trier of fact." (458 U.S. at pp. 873-874 [73 L.Ed.2d at p. 1207].) The court cautioned that "some leeway" should be allowed for the fact that the defendant offers a description of the material evidence, rather than the evidence itself. (*Id.* at p. 874 [73 L.Ed.2d at p. 1207].) The court also suggested that the materiality determination be deferred until after the presentation of all the evidence at trial. (*Ibid.*)

This court reevaluated *Mejia* in *Cordova* v. *Superior Court* (1983) 148 Cal.App.3d 177 [195 Cal.Rptr. 758]. Even though the case was decided after passage of Proposition 8, this court noted that "[n]o one contends that Proposition 8 requires California to follow the federal rule." (*Id.* at p. 183, fn. 1.) Instead, the state argued that *Mejia* was based on federal law and that California was obliged to follow the new federal rule in *Valenzuela-Bernal* regarding the materiality of deported alien witnesses. While it was unclear whether *Mejia* was based on federal or state due process principles, this court concluded that California was not required to follow the United States Supreme Court's ruling. "It is clear, however, that California has the right to dispose of the issue upon independent state grounds, the California Constitution being 'a document of independent force.' [Citations.]" (148 Cal.App.3d at p. 183.) The court noted the widespread application of the same materiality test in cases involving paid informers and the preservation of demonstrative evidence, such as *People* v. *Hitch* (1974) 12 Cal.3d 641 [117 Cal.Rptr. 9, 527 P.2d 361]. It concluded that the *Mejia* materiality test was "a California doctrine of independent existence," and not changed by the Supreme Court's decision in *Valenzuela-Bernal.* (148 Cal.App.3d at p. 184.)

Thus, this court rejected the theory that *Mejia* had been superseded by *Valenzuela-Bernal.* This rejection, however, was based on the independent state grounds doctrine which was in full force at the time of *Cordova.* The impact of Proposition 8 on cases involving the suppression of evidence had not yet been determined. Since that time, however, the California Supreme Court has extensively interpreted the impact of Proposition 8 in areas other than search and seizure.

B.  *The Impact of Proposition 8.*

The "Truth-in-Evidence" provision of Proposition 8 pertinently provides: ". . . [R]elevant evidence shall not be excluded in any criminal proceeding, . . . Nothing in this section shall affect any existing statutory rule of evidence relating to privilege or hearsay, . . ." (Cal. Const., art. I, § 28, subd. (d).)

*In re Lance W.* (1985) 37 Cal.3d 873 [210 Cal.Rptr. 631, 694 P.2d 744] examined the impact of Proposition 8 on California's vicarious exclusionary rule. "What Proposition 8 does is to eliminate a judicially created *remedy* for violations of the search and seizure provisions of the federal or state Constitutions, through the exclusion of evidence so obtained, except to the extent that exclusion remains federally compelled." (*Id.* at pp. 886-887.) *Lance* expressly did not reach the question of "whether section 28(d)

mandates admission of evidence obtained in violation of other constitutional guarantees . . . ." (*Id.* at p. 885, fn. 4.)

*People* v. *May* (1988) 44 Cal.3d 309 [243 Cal.Rptr. 369, 748 P.2d 307] involved the issue of whether statements obtained in violation of the privilege against self-incrimination may be used to impeach a defendant's testimony. The state rule had been to exclude such statements for impeachment; the federal rule permitted impeachment. The question was whether section 28, subdivision (d) abrogated the state exclusionary rule relating to self-incrimination, even though it had expressly excluded "rules of privilege:" "First, the 'Truth-in-Evidence' provision of our Constitution was probably intended by the California voters as a means of (1) abrogating *judicial* decisions which had required the exclusion of relevant evidence solely to deter police misconduct in violation of a suspect's constitutional rights under the state Constitution, while (2) preserving *legislatively* created rules of privilege insulating particular communications, such as the attorney-client or physician-patient privilege. As we recently observed, 'The people have apparently decided that the exclusion of evidence is not an acceptable means of implementing those rights, *except as required by the Constitution of the United States.'* (*In re Lance W., supra*, 37 Cal.3d 873, 887, italics added.)" (44 Cal.3d at p. 318.) The previous rule prohibiting impeachment was a "judicially created exclusionary rule *expressly rejected* by the United States Supreme Court under the federal Constitution," rather than a statutory privilege created by the Legislature. (*Ibid.*, italics in original.) Thus, the federal rule permitting impeachment with statements obtained in violation of the privilege against self-incrimination controlled.

This court interpreted the impact of section 28, subdivision (d) on the materiality of demonstrative evidence, formerly determined in *People* v. *Hitch, supra*, 12 Cal.3d 641, 649. *Hitch* found a due process duty to preserve evidence whenever there exists a reasonable possibility that the evidence would have constituted favorable evidence on the issue of guilt or innocence. In *People* v. *Tierce* (1985) 165 Cal.App.3d 256, 263 [211 Cal.Rptr. 325], this court held that section 28, subdivision (d) required that the due process and materiality issues in *Hitch* be decided by application of federal law, in particular, the materiality test in *California* v. *Trombetta, supra*, 467 U.S. 479.

In *People* v. *Epps* (1986) 182 Cal.App.3d 1102 [227 Cal.Rptr. 625], this court further discussed the extension of section 28, subdivision (d) to the *Hitch* materiality issue: "The question is how can *Hitch* be overruled by Proposition 8 as stated in *Tierce*. . . . [¶] Whenever the *remedy* for the violation of a federal constitutional right, regardless of whether it is search and seizure, due process, right to confrontation, etc., is not covered by a

California statutory scheme such as privilege, and involves the *exclusion* of evidence, Proposition 8 requires the court to apply federal judicial standards." (182 Cal.App.3d at p. 1113.) *Epps* also addressed the difference, if any, of the application of Proposition 8 to alternative remedies of excluding evidence and dismissing charges: "[I]t can be argued that Proposition 8 does not address this area of constitutionally guaranteed access to evidence except in those cases where the court, in fashioning a remedy, considers exclusion of evidence. Here the court was never faced with a request to exclude evidence but was asked to dismiss the case or, in the alternative, to dismiss all specific intent crimes. As previously discussed, the 'trigger' to Proposition 8 occurs when exclusion of evidence is considered as a remedy. We find that, . . . where the evidence allegedly lost or destroyed is potentially exculpatory, and the usual remedy is exclusion of evidence potentially inculpatory, the functional remedial equivalent of exclusion of evidence is dismissal or dismissal of specific intent crimes." (182 Cal.App.3d at p. 1115.) Thus, this court concluded that the reach of Proposition 8 includes not only suppression of evidence cases, but instances where the judicially created remedy is dismissal of charges.

In *People* v. *Johnson* (1989) 47 Cal.3d 1194 [255 Cal.Rptr. 569, 767 P.2d 1047], a case dealing with lost fingerprint diagrams, the Supreme Court held that the previous *Hitch* exclusionary rule was governed by the reasoning of *Lance W.* and Proposition 8. "[S]ection 28, subdivision (d) has limited the power of the court to create nonstatutory rules for the exclusion of unlawfully seized evidence if those rules afford greater protection to a criminal defendant than does the Fourth Amendment." (47 Cal.3d at p. 1234.) The court used *Trombetta*'s federal standard of materiality in evaluating defendant's due process claim regarding the lost evidence.

The California Supreme Court has not ruled on the effect of Proposition 8 on *Mejia* and its standard applicable to deported witnesses. However, the Fourth District addressed the issue in *People* v. *Lopez, supra*, 198 Cal.App.3d 135, and determined that Proposition 8 abrogated *Mejia* and required the application of a federal standard in such cases. The court relied on the above quoted language from *Epps* in applying Proposition 8 in the context of dismissal, rather than suppression. "[S]ince dismissals on *Mejia* grounds are equivalent to the exclusion of evidence, and since the undisputed import of subdivision (d) is to prevent the exclusion of evidence on independent state grounds, it follows that independent state grounds no longer justify the rejection of the federal standard of materiality in *Mejia* cases." (198 Cal.App.3d at p. 146.) It also relied on this court's application

of Proposition 8 in the *Hitch* line of cases since they involve similar determinations of materiality.[1]

*Lance, May*, and *Johnson* illustrate the broad application of Proposition 8 to require federal standards for the exclusion of evidence in cases other than searches and seizures. This court's broad language in *Epps* and the Fourth District's holding in *Lopez* support the application of Proposition 8 to *Mejia* motions even though the requested remedy is dismissal of all charges instead of exclusion of evidence. ■ Since dismissal amounts to the exclusion of all the evidence against the defendant, the *Mejia* motion for dismissal pulls the "trigger" to apply Proposition 8 and the federal materiality test.

Based on the foregoing, we conclude that Proposition 8 abrogated *Mejia* and its state standard of materiality applicable to deported witnesses. We now address the appropriate federal standard.

C.  *The Federal Standard of Materiality.*

■ The most recent United States Supreme Court opinion dealing specifically with *Mejia*-type motions and the proper federal standard of materiality applicable to a deported witness held that the charges should not be dismissed unless the defendant "makes a plausible showing that the testimony of the deported witnesses would have been material and favorable to his defense, in ways not merely cumulative to the testimony of available witnesses." (*United States* v. *Valenzuela-Bernal, supra,* 458 U.S. at p. 873 [73 L.Ed.2d at p. 1206].)

The Attorney General, however, argues that *California* v. *Trombetta, supra,* 467 U.S. 479 superseded *Valenzuela-Bernal* and establishes the federal standard applicable to *Mejia* motions. As discussed above, the California Supreme Court has held that *Trombetta* is the appropriate test for determining the materiality of demonstrative evidence in situations formerly controlled by *Hitch*. (*People* v. *Johnson, supra,* 47 Cal.3d 1194, 1234.) The Attorney General contends that since the *Mejia* materiality test was the same as previously used in *Hitch*, the same standard that replaced *Hitch* should also replace *Mejia*.

*Trombetta* involved the police's failure to preserve breath samples of suspected drunken drivers. The court reviewed the group of constitutional privileges which "delivers exculpatory evidence into the hands of the ac-

---

[1] *Lopez* was decided before the Supreme Court held in *Johnson* that *Hitch* did not survive Proposition 8.

cused, thereby protecting the innocent from erroneous conviction and ensuring the integrity of our criminal justice system." (*California* v. *Trombetta, supra*, 467 U.S. at p. 485 [81 L.Ed.2d at p. 420].) Among these is the prosecution's constitutional obligation to report to the defendant and the court whenever a government witness lies under oath. The prosecution also has a constitutional duty, even in the absence of a request, to turn over exculpatory evidence that would raise a reasonable doubt about defendant's guilt. (*Ibid.*)

The court also reviewed the "less clear" area of whether the due process clause imposed upon the government the additional responsibility of guaranteeing access to exculpatory evidence beyond the government's possession. "On a few occasions, we have suggested that the Federal Government might transgress constitutional limitations if it exercised its sovereign powers so as to hamper a criminal defendant's preparation for trial." (467 U.S. at p. 486 [81 L.Ed.2d at p. 420].) The court cited *Valenzuela-Bernal,* and noted that "we acknowledged that the Government could offend the Due Process Clause of the Fifth Amendment if, by deporting potential witnesses, it diminished a defendant's opportunity to put on an effective defense." (*Ibid.*)

The court proceeded to evaluate the government's duty to take affirmative steps to preserve physical evidence on behalf of defendants, an area "never squarely addressed" before by the court. (467 U.S. at p. 486 [81 L.Ed.2d at p. 420].) The court considered the importance of the breath samples and the effect it might have had on the defendant's trial in formulating the following constitutional test: "Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, [citation], evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (467 U.S. at pp. 488-489 [81 L.Ed.2d at p. 422].) While *Trombetta* refers to *Valenzuela-Bernal* in discussing other due process concerns, there is no indication that it proposed to overrule or limit *Valenzuela-Bernal* in any way. The court acknowledged that it was ruling on an area "never squarely addressed" before by a previous opinion. In contrast, *Valenzuela-Bernal* is clearly an exhaustive analysis of the government's duty, and the defendant's burden, in imposing sanctions for the deportation of a material witness.

In *Arizona* v. *Youngblood* (1988) 488 U.S. 51 [102 L.Ed.2d 281, 109 S.Ct. 333], the court examined the failure of police to preserve a semen sample in

a sexual assault case. *Trombetta*'s materiality test was approvingly cited, and the court noted that the instant case presented a greater likelihood that the preserved materials would have enabled the defendant to exonerate himself than in *Trombetta*. "[B]ut here, unlike in *Trombetta,* the State did not attempt to make any use of the materials in its own case in chief." (488 U.S. at p. 56 [102 L.Ed.2d at p. 288, 109 S.Ct. at p. 336].) The court also approvingly cited *Valenzuela-Bernal* and its holding regarding deportation of material witnesses. (*Id.* at p. 57 [102 L.Ed.2d at p. 289, 109 S.Ct. at p. 337].)

*Youngblood* emphasizes the importance of the state's good or bad faith in evaluating whether or not a constitutional violation has occurred through its loss or destruction of physical evidence: "[W]e think the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." (*Id.* at p. 57 [102 L.Ed.2d at p. 289, 109 S.Ct. at p. 337].) The court clearly demonstrates a "difference in treatment" for this type of evidence through its discussion supporting the consideration of the police's bad faith. "We think that requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly requires it, . . . We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." (*Id.* at p. 58 [102 L.Ed.2d at p. 289, 109 S.Ct. at p. 337].) It notes that *Trombetta* dealt with evidence that exhibited exculpatory value *before* it was destroyed. "Here, respondent has not shown that the police knew the semen samples would have exculpated him" before it was destroyed. (*Id.* at p. 56 [102 L.Ed.2d at p. 288, 109 S.Ct. at p. 336].) "[T]his evidence was simply an avenue of investigation that might have led in any number of directions. The presence or absence of bad faith . . . must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." (*Id.* at pp. 56-57, fn. 1 [102 L.Ed.2d at pp. 288-289, 109 S.Ct. at 336-337].) As in *Trombetta,* the court does not indicate that it is overruling or disapproving of *Valenzuela-Bernal* for the unavailability of material witnesses.

As discussed above, the Fourth District determined that *Mejia* did not survive Proposition 8. In *People v. Lopez, supra*, 198 Cal.App.3d 135, the court determined that *Trombetta* defined the materiality standard applicable to both *Hitch* and *Mejia* motions. "[T]hese two cases set the same standard of materiality for both testimonial and demonstrative evidence. *Hitch* expressly rejected any distinction between testimony and demonstra-

tive evidence since the latter also requires testimony for its presentation." (198 Cal.App.3d at p. 143.) It relied upon language in *Cordova* which, while rejecting *Valenzuela-Bernal,* emphasized the importance of having the same standard of materiality for both testimonial and demonstrative evidence. The court felt such consistency should continue after Proposition 8: "Since the evaluation of the materiality of demonstrative evidence does not significantly differ from the evaluation of the materiality of testimony, and since the same materiality standard has traditionally been applied to both types of evidence, consistency requires that subdivision (d) be construed to require the use of the federal standard of materiality in *Mejia* as well as *Hitch* situations." (198 Cal.App.3d at p. 144.)

While Proposition 8 requires the application of federal standards, the Fourth District determined that *Trombetta,* rather than *Valenzuela-Bernal,* was the appropriate test: "From the breadth of the discussion in *Trombetta,* which included mention of *Valenzuela-Bernal* [citation], we conclude that the United States Supreme Court intended to state in *Trombetta* a more definitive and precise formulation of the constitutional standard of materiality in all loss of evidence cases. We hold that *Trombetta* states the standard of materiality applicable in both *Mejia* and *Hitch* contexts." (*People* v. *Lopez, supra,* 198 Cal.App.3d at p. 145.) Thus, the Fourth District adopted *Trombetta* as the appropriate federal standard of materiality in *Mejia* motions. *Lopez* was decided before *Youngblood,* and the Fourth District has yet to expand its ruling to include a joint *Trombetta/Youngblood* materiality test for deported witnesses.

The Attorney General urges this court not only to follow Lopez and adopt *Trombetta* as the appropriate federal standard, but to go further and include *Youngblood* as an additional test of materiality. We decline to do so for the following reasons. First, neither *Trombetta* nor *Youngblood* indicate that the Supreme Court was overruling *Valenzuela-Bernal. Trombetta* launched into its discussion of the materiality of demonstrative evidence, and the government's duty to preserve such evidence, with the statement that it was entering an area it had "never squarely addressed." Such a statement implies that *Valenzuela-Bernal* dealt with an area entirely separate and apart from the concerns which were dealt with in *Trombetta.*

A review of subsequent cases from the United States Supreme Court and Ninth Circuit also fails to reflect that *Valenzuela-Bernal* has been overruled. In addition, these cases have limited the application of *Trombetta/Youngblood* to demonstrative or physical evidence. (See *United States* v. *Sherlock* (9th Cir. 1989) 865 F.2d 1069, 1075 [failure to preserve sperm sample]; *Miller* v. *Vasquez* (9th Cir. 1989) 868 F.2d 1116, 1119-1120 [failure to preserve bloodstained jacket].) California cases, with the exception of

*Lopez*, have also applied *Trombetta* and *Youngblood* exclusively in the area of demonstrative evidence. (See *People* v. *Huston* (1989) 210 Cal.App.3d 192, 212-213 [258 Cal.Rptr. 393] [missing documents]; *People* v. *Martinez* (1989) 207 Cal.App.3d 1204, 1216-1218 [255 Cal.Rptr. 691] [failure to check for bloodstains]; but see *People* v. *Gonzales* (1989) 209 Cal.App.3d 1228, 1234 [destruction of notes which might have listed a "material witness"].) In contrast, the California Supreme Court used *Valenzuela-Bernal* to test the materiality of an intimidated *witness* to determine if due process had been violated. (*In re Martin* (1987) 44 Cal.3d 1, 30-32 [241 Cal.Rptr. 263, 744 P.2d 374].)

There are differences between *Valenzuela-Bernal, Trombetta,* and *Youngblood,* and the analysis of "loss of evidence" in each case. *Valenzuela-Bernal* analyzes the materiality issue based on circumstances in which the defendant has been denied the opportunity to interview a deported witness. While the court acknowledged the problems inherent in such a situation, it refused to dispense with the materiality requirement. Instead, it required that the defendant make a plausible showing that the witness's testimony would have been material and favorable to his defense. Sanctions are required if there is a reasonable likelihood that the testimony could have affected the judgment. It suggested that trial courts "afford some leeway for the fact that the defendant necessarily proffers a description of the material evidence rather than the evidence itself." (*United States* v. *Valenzuela-Bernal, supra,* 458 U.S. at p. 874 [73 L.Ed.2d at p. 1207].)

*Trombetta's* analysis of materiality focused on the problems presented by the destruction of physical evidence and the government's duty "to take affirmative steps to preserve evidence . . . ." (*California* v. *Trombetta, supra,* 467 U.S. at p. 486 [81 L.Ed.2d at p. 420].) The court emphasized the defendant's ability to obtain comparable evidence by other reasonably available means to compensate for the government's destruction of evidence. The defendant could impeach the reliability of the Intoxilyzer through evidence of operator error, false positives, or calibration of the machine itself. (*Id.* at p. 490 [81 L.Ed.2d at p. 423].) This allows the defendant to attack the veracity of the inculpatory test independent of producing the original breath sample, and eliminates any materiality problem.

Similarly, *Youngblood* refers to the fact that it is dealing with the "failure of the State to preserve evidentiary material of which no more can be said than that *it could have been subjected to tests,* the results of which might have exonerated the defendant." (*Arizona* v. *Youngblood, supra,* 488 U.S. at p. 57 [102 L.Ed.2d at p. 289, 109 S.Ct. at p. 337], italics added.) This reference to "testing" evidence seems inconsistent with questioning a material witness. In addition, it seems to deal with a different variety of evidence:

evidence which is "potentially useful" rather than exculpatory on its face. (*Ibid.*) The few interpretations of *Trombetta* and *Youngblood* seem to view the cases as a two-part test of materiality. This wholesale application to all types of physical evidence is questionable, however, given *Youngblood*'s reference to various degrees of evidence ("apparent" exculpatory value compared to "potentially useful").

*Lopez* justified its reliance on *Trombetta* because of what it perceived as "the breadth of the discussion in *Trombetta*" which was intended to state "a more definitive and precise formulation of the constitutional standard of materiality in *all* loss of evidence cases." (*People* v. *Lopez, supra,* 198 Cal.App.3d at p. 145, italics added.) While *Trombetta* engages in a thorough analysis of other "loss of evidence" cases, it does so in the context of examining the illegal *destruction* of evidence in violation of the due process clause of the Fourteenth Amendment. (*California* v. *Trombetta, supra,* 467 U.S. at p. 491 [81 L.Ed.2d at pp. 423-424].) It examines the actions of the law enforcement agencies in either preserving or destroying evidence during an investigation and if that evidence is available in some other form. In contrast, *Valenzuela-Bernal* discusses a different aspect of the state's duty to preserve evidence: the Sixth Amendment right to compulsory process of witnesses and the Fifth Amendment due process clause. (*United States* v. *Valenzuela-Bernal, supra,* 458 U.S. at p. 873 [73 L.Ed.2d at p. 1206].) *Valenzuela-Bernal* was derived with respect to the difficult, but not impossible, task of trying to show what testimony the deported witnesses could have contributed to the defendant's cause. It acknowledged that the defendant himself may be the best witness as to what evidence the deported witness might possess, and that the defendant's explanation under oath of such evidence would be an acceptable method of establishing the materiality of the missing witness. (*United States* v. *Valenzuela-Bernal, supra,* 458 U.S. at pp. 871, 873 [73 L.Ed.2d at pp. 1205-1206].) *Trombetta* does not address these concerns but requires the evidence to already possess an exculpatory value.

*Lopez* was also concerned with maintaining consistency between the materiality tests for both *Mejia* and *Hitch* motions. This was based on language in *Cordova* noting the similar origins for both tests. While consistency is an important consideration, it must bow to contrasting opinions by the United States Supreme Court in these two areas. The above interpretation of *Trombetta* and *Valenzuela-Bernal* implies that the same materiality standard is not applicable to both situations.

In summary, *Trombetta* and *Valenzuela-Bernal* address two different aspects of the state's duty to preserve exculpatory evidence. While *Trombetta* certainly presents an in-depth discussion of the constitutional duty to

preserve physical evidence, there is nothing in the opinion to indicate that it intended to supersede *Valenzuela-Bernal*'s examination of unavailable deported witnesses. The rationale of each case is supported by the distinctive aspects of physical evidence (*Trombetta*) and unavailable witnesses (*Valenzuela-Bernal*). *Youngblood* presents the most obvious distinction when it refers to evidence which may be subjected to tests.

We conclude that the appropriate federal standard of materiality to apply in witness deportation cases is *Valenzuela-Bernal.*

## II.

### DID ALCALA'S DEPORTATION REQUIRE DISMISSAL OF THE CHARGES AGAINST RESPONDENT UNDER VALENZUELA-BERNAL?

■ To meet the federal materiality standard contained in *Valenzuela-Bernal,* the defendant must make a "plausible showing that the testimony of the deported [witness] would have been material and favorable to his defense, in ways not merely cumulative to the testimony of available witnesses." This places a heavier burden upon the defendant than the *Mejia* state standard since he must show that the deported witness's testimony would have been favorable. (*Cordova* v. *Superior Court, supra*, 148 Cal.App.3d 177, 182, 184.)

### A. *Possession of Cocaine for Sale.*

■ Applying the *Valenzuela-Bernal* standard to the narcotics charge, respondent failed to make a "plausible showing" that Benjamin Alcala's testimony would have been favorable. The proof of materiality tendered by respondent was simply the police report, the preliminary hearing transcript, and a stipulation that Alcala was deported to Mexico on January 4, 1989. The only showing respondent made as to Alcala's testimony on the narcotics charge is contained in the police report. It provides: "Alcala stated there were a lot of people visiting Valencia at the apartment, but he did not know what the visits were about and had no knowledge of narcotics dealing from the apartment."

This showing falls far short of that required by *Valenzuela-Bernal.* It is more incriminatory than exculpatory. While Alcala stated that he was unaware of narcotics sales from the apartment, he admitted that Valencia had many visitors at the apartment for unknown reasons. There is no showing from respondent or any other source that Alcala could identify the owner of the men's blazer or the cocaine found in it. We cannot speculate on Alcala's anticipated testimony and must limit our analysis to the show-

ing contained in the record before us. We note that respondent made no effort to represent the nature of any favorable testimony Alcala would have given, even though clearly authorized and encouraged to do so under *Valenzuela-Bernal.*

We conclude that the trial court erred in dismissing count I charging respondent with possession of cocaine for sale (Health & Saf. Code, § 11351).

## B. *Firearm Enhancements.*

■ Respondent made an adequate showing that Alcala's anticipated testimony on the firearm enhancement allegations was material and favorable under the *Valenzuela-Bernal* standard. The source of this showing was the police report. The officer reported that Alcala ". . . was asked about the firearm that was located and he stated it belonged to Avila."

We realize that a trier of fact could logically accept as true Benjamin Alcala's statement about the gun and nevertheless find the enhancement to be true. One may be "armed with a firearm" in violation of Penal Code section 12022, subdivision (a), without owning it. However, the test is not whether the deported witness's testimony would negate and disprove the charge. It is whether a "plausible showing" was made that the testimony would have been "material and favorable" to his defense. (*United States* v. *Valenzuela-Bernal, supra,* 458 U.S. at p. 873 [73 L.Ed.2d at p. 1206].) Alcala's testimony that Avila owned the firearm is consistent with respondent's defense that he wasn't armed or in possession of it. The weight to be accorded such testimony lies within the discretion of the trier of facts.

We are mindful that the government's good or bad faith in making deportation decisions may have a bearing on application of the federal standard of materiality under *Valenzuela-Bernal*: "To summarize, the responsibility of the Executive Branch faithfully to execute the immigration policy adopted by Congress justifies the prompt deportation of illegal-alien witnesses upon the Executive's good-faith determination that they possess no evidence favorable to the defendant in a criminal prosecution. The mere fact that the Government deports such witnesses is not sufficient to establish a violation of the Compulsory Process Clause of the Sixth Amendment or the Due Process Clause of the Fifth Amendment. A violation of these provisions requires some showing that the evidence lost would be both material and favorable to the defense." (*United States* v. *Valenzuela-Bernal, supra,* 458 U.S. at pp. 872-873 [73 L.Ed.2d at p. 1206].)

It is noteworthy that the prosecution made no effort to resist respondent's motion at the trial court level by alleging or attempting to prove absence of

bad faith. The police report contained Alcala's anticipated testimony and it was arguably material and favorable to the defense, at least as to the firearm enhancement allegations. Nevertheless, the prosecution gave no explanation for its failure to give respondent or his counsel advance notice of Alcala's deportation and simply argued, "It is not a reasonable possibility that Mr. Alcala's testimony would tend to prove the defendant's innocence."

### DISPOSITION

The dismissal of count I alleging a violation of Health and Safety Code section 11351 (possession of cocaine for sale) is reversed. In all other respects the order of March 10, 1989, is affirmed.

Martin, Acting P. J., and Stone (W. A.), J., concurred.

A petition for a rehearing was denied April 4, 1990, and appellant's petition for review by the Supreme Court was denied June 7, 1990.