75 Cal.Rptr.3d 533 (2008)
162 Cal.App.4th 373
The PEOPLE, Plaintiff and Appellant,
v.
Armando Monter JACINTO, Defendant and Respondent.
No. A117076.
Court of Appeal of California, First District, Division Five.
April 23, 2008.
*534 Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Senior Assistant Attorney General, Stan Helfman, Supervising Deputy Attorney General, Amy Haddix, Deputy Attorney General, for Plaintiff and Appellant.
Matthew Zwerling, Stephanie Clark, First District Appellate Project, for Defendant and Respondent.
JONES, P.J.
In this case, a defense witness, incarcerated in county jail and facing deportation, was served with a subpoena requiring his personal appearance at trial. Upon completion of his sentence, the witness was immediately deported. Asserting a deprivation of constitutional rights under the Fifth, Sixth, and Fourteenth Amendments, defendant Armando Monter Jacinto (Jacinto) moved the trial court to dismiss an information charging him with attempted murder and assault with a deadly weapon. The trial court granted the motion and the People appeal from the dismissal order.
*535 The People contend the trial court erred in ordering dismissal because there was no state action. Alternatively, the People urge, "accepting that the state cooperated with federal authorities to deport the witness, [Jacinto] failed to demonstrate that state officials [acted with] knowledge of the materiality of the witness's testimony...." and in bad faith. We agree with the former contention and conclude Jacinto failed to establish "state action." He has not shown any knowledge of the materiality of the witness's testimony by the jailers or any member of the prosecutorial team. Accordingly, we reverse.

FACTUAL AND PROCEDURAL BACKGROUND
The facts relating to the charged offenses are taken from the preliminary hearing. Eric Garcia and Victor Retana went to a restaurant at about 6:30 p.m. on May 12, 2006. Others, including Jacinto and a woman, were also at the restaurant. Garcia testified that he lost some money in a jukebox and asked the restaurant owner for a refund. Jacinto told the owner not to give a refund, but the owner gave Garcia his money back. As Garcia was leaving the restaurant, he saw Retana standing near Jacinto, the woman, the owner, and an older man. Retana and Jacinto pushed each other, then Jacinto "moved his hand" and Retana "jumped back." Retana held his side and started to bleed profusely.[1] Garcia did not see anyone with a knife and did not see the incident clearly because Jacinto, the woman, the owner and the older man were all "pushing at the time of the stabbing[.]" Garcia heard the woman deny she had stabbed Retana.
A detective who interviewed Retana testified that according to Retana, Garcia got into an argument with an older man, and Jacinto intervened and began arguing with Garcia. Retana stepped in to help Garcia and Jacinto pushed Retana. When Retana pushed back, Jacinto stabbed him. Retana identified Jacinto from a photographic lineup as the person who had stabbed him. Retana confirmed it was Jacinto, and not a woman, who stabbed him.
On June 13, 2006, an information was filed charging Jacinto with attempted murder (§§ 664/187, subd. (a)) (count I) with enhancements for infliction of great bodily injury (§ 12022.7, subd. (a)) and personal use of a knife (§ 12022, subd. (b)(1)), and assault with a deadly weapon (§ 245, subd. (a)(1)) (count II) with an enhancement for infliction of great bodily injury.
In July 2006, defense investigator Carlos Escobedo interviewed Sonoma County Jail inmate Nicolas Esparza on two separate occasions.[2] Esparza stated he was at the restaurant on the day of the stabbing and that he heard a customer complaining to the owner that the jukebox was "eating ... the bills." Approximately 20 minutes later, Esparza went outside and saw a man and a woman, and two other men, arguing in front of the restaurant. Esparza saw the woman remove a blade from her purse and stab the man. Esparza was 99 percent sure it was a woman, and not a man, who stabbed the victim. Esparza left the restaurant and did not speak to the police. Esparza later encountered Jacinto in jail and learned that Jacinto had been charged with the stabbing. Esparza stated he did not receive anything in exchange for providing a statement, and said lie agreed to be interviewed "because I know ... that he is not [ ] guilty...."
*536 Escobedo testified that of all of the witnesses he had interviewed, one witness suspected that the woman stabbed Retana, but Esparza was the only one who stated he saw the woman stab Retana. A waitress Escobedo interviewed told him that she saw Esparza at the restaurant on the night of the stabbing.
On October 6, 2006, Escobedo served the Sonoma County Sheriffs Department with a subpoena for Esparza's appearance at trial on October 26, 2006. After discussing with his supervisor the importance of Esparza's testimony, Escobedo returned to jail on October 16, 2006, and personally served Esparza. At that time, Esparza mentioned that he was going to be deported. While Escobedo was at the jail to personally serve Esparza, a sheriffs department employee conducted a computer search and confirmed that Esparza was listed as a subpoenaed witness. The employee also stated she thought Esparza was going to be deported. Escobedo did not inform that employee or anyone at the jail that Esparza was needed as a witness for the defense or raise any concern about the witness's deportation. On October 17, 2006, Esparza completed his sentence and the sheriffs department released him to the immigration authorities. Esparza was deported the following day.
Jacinto filed a nonstatutory motion to dismiss the information on the ground that the sheriffs department's act of releasing Esparza, a material witness under subpoena, to the federal government for deportation deprived him of his constitutional right to compulsory process and a fair trial. The trial court provided the prosecution with time to locate Esparza, but the prosecution was unable to find him. The trial court found Esparza's testimony was material and favorable to the defense, and that the sheriffs office knew Esparza was under subpoena when it released him to the immigration authorities. The trial court ruled that bad faith on the part of the prosecution was not required to establish a constitutional violation, and granted Jacinto's motion to dismiss the information. The People filed a timely notice of appeal.

DISCUSSION
The Sixth Amendment guarantees a criminal defendant "compulsory process for obtaining witnesses in his favor." (U.S. Const., 6th Amend.) Principles of due process also provide the defendant with the right to offer testimony that is material and favorable to him. (United States v. Valenzuela-Bernal (1982) 458 U.S. 858, 867, 872-873, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (Valenzuela).) "The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law." (Washington v. Texas (1967) 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019.)
Valenzuela, supra, 458 U.S. at pages 872-873, 102 S.Ct. 3440, addressed whether the government's act of deporting a witness violated the defendant's right to compulsory process and a fair trial. There, border patrol agents stopped the defendant's car near a checkpoint and arrested him and three passengers. (Id. at pp. 860-861, 102 S.Ct. 3440.) An Assistant United States Attorney determined that two of the passengers had no material evidence relating to whether the defendant *537 had committed the crime of transporting illegal aliens, and had them deported. (Ibid.) A third passenger was detained to provide testimony for the prosecution. (Ibid.) The defendant moved to dismiss the indictment, claiming the government's deportation of the two passengers violated his right to due process and compulsory process. (Ibid.) The trial court denied the defendant's motion, and after a bench trial, found him guilty as charged. (Id. at p. 862,102 S.Ct. 3440.)
The Ninth Circuit reversed, holding that the government violates a defendant's right to compulsory process and due process when it deports alien witnesses before allowing defense counsel an opportunity to interview them. The United States Supreme Court upheld the conviction. (Valenzuela, supra, 458 U.S. at p. 873, 102 S.Ct. 3440.) Emphasizing that a defendant has a constitutional right to obtain only witnesses in his favor, the court held a defendant cannot establish a Sixth Amendment violation "without making some plausible explanation of the assistance he would have received from the testimony of the deported witnesses." (Id. at p. 871,102 S.Ct. 3440, fn. omitted.) The court held that sanctions were warranted only if the defendant could show that the deported witnesses would have provided evidence that is both "material and favorable to his defense, in ways not merely cumulative to the testimony of available witnesses." (Id. at p. 873, 102 S.Ct. 3440.) It is settled that this federal standard of materiality is applicable to a defendant's due process claims based on lost evidence due to deportation of a witness. (People v. Valencia (1990) 218 Cal.App.3d 808, 811-812, 267 Cal.Rptr. 257.)
The People do not dispute that Esparza was a material witness whose testimony would have been favorable to Jacinto. Jacinto does not dispute that the District Attorney's office had no knowledge of the service of a subpoena on witness Esparza,[3] or that Esparza was a material defense witness. Rather, as a threshold matter, the People assert that dismissal was improper because the release of witness Esparza by county jail personnel does not establish state action. Moreover, the People urge, the trial court should have required Jacinto to make a showing that the state acted with "knowledge of [the] materiality or in bad faith."[4] As we explain, we agree the trial court erred when it concluded that the sheriffs department's act of releasing Esparza to federal custody was state action.[5]
Notably, in Valenzuela, the federal government was prosecuting the defendant, and the federal government's Assistant United States' Attorney made the determination that two passenger witnesses "possessed no evidence material to the prosecution or defense ... for transporting illegal aliens," and had the witnesses deported. (Valenzuela, supra, 458 U.S. at p. 861, 102 S.Ct. 3440.) The case before us presents a significantly different factual predicate. The sheriffs department was no more than the custodian of *538 witness Esparza. In this case, it was not a part of the prosecutorial investigative team. We agree with the People that the action of the sheriffs department or county jail personnel may not be attributed to the prosecution. (See People v. Superior Court (Barrett) (2000) 80 Cal.App.4th 1305, 1317, 96 Cal.Rptr.2d 264 [California Department of Corrections, which houses felons while they serve their sentences, is a distinct and separate governmental entity from the District Attorney], cf. U.S. v. Santiago (9th Cir.1995) 46 F.3d 885, 894 [Bureau of Prisons files were within the possession and control of the United States Attorney for discovery purposes because Bureau of Prisons and the United States Attorney's Offices are both branches of the Department of Justice and federal prosecutors therefore have access to prison files]).[6]
Moreover, the sheriffs department's role and duty as the custodian of witness Esparza was constrained by the service of a notice of immigration detainer for Esparza on the sheriffs department by the federal Immigration and Customs Enforcement agency. In finding an absence of state action in circumstances where the federal executive branch was both jailer and the actor assessing the materiality of the deported witnesses' prospective testimony, Valenzuela made clear the obligation of the federal executive branch "to execute the immigration policy adopted by Congress justifies the prompt deportation of illegal-alien witnesses upon the Executive's good-faith determination that they possess no evidence favorable to the defendant in a criminal prosecution." (Valenzuela, supra, 458 U.S. at p. 872, 102 S.Ct. 3440.) Pursuant to the Supremacy Clause, U.S. Constitution, article VI, section 2, the sheriffs department operating the county jail had no power to interfere with the federal deportation proceedings. (Tarble's Case (1871) 80 U.S. (13 Wall.) 397, 410, 20 L.Ed. 597; see Gates v. Municipal Court (1992) 9 Cal.App.4th 45, 53', 11 Cal.Rptr.2d 439.) This is not to say Jacinto was without a remedy. Jacinto could have brought to the attention of the prosecutor his desire to produce Esparza's evidence, or sought the assistance of the District Attorney's office in securing the witness's appearance at trial in the face of the immigration detainer. (See 8 C.F.R. §§ 215.2(a), 215.3(g) [federal immigration regulations prohibit departure from the United States by an alien who is needed as a witness in a criminal case unless the prosecuting authority consents].)[7]
Finally, the record discloses no information given to the sheriffs department concerning the nature of the witness's testimony or role in the events at issue, nor any basis to have knowledge of the materiality of the witness's testimony. Jail personnel knew no more than that the witness's *539 testimony was wanted by the defense. This does not establish knowledge of the materiality of Esparza's testimony. We do not believe that the service of a subpoena on a sheriffs department or jail personnel is sufficient to inform the department or the prosecution that a witness has evidence that is "material and favorable to his defense, in ways not merely cumulative to the testimony of available witnesses." (See Valenzuela, supra, 458 U.S. at p. 873, 102 S.Ct. 3440.) Further, we conclude it is unreasonable to impose a duty on the jailers to make an inquiry into the materiality of the testimony a witness may offer every time jail personnel are served with a subpoena requiring a deportable witness to appear at trial. The jailers acted in accord with their normal practice of releasing an inmate at the completion of his sentence, and should not be required to seek a court determination of whether the subpoena served by Escobedo required them to continue to hold Esparza.
Esparza told Escobedo on October 16, 2006, that he was going to be deported. The sheriffs department employee who confirmed that Esparza was identified in jail records as a subpoenaed witness also said she thought Esparza was going to be deported. Nevertheless, there is no evidence that Escobedo advised the employee or anyone else at the jail that Esparza was a necessary or favorable witness for the defense, or that the sheriffs department released Esparza to gain a tactical advantage over defendant Jacinto at trial. Without knowledge of the materiality of the deported witness's testimony, there was no violation of Jacinto's rights to compulsory or due process, and the trial court erred in granting the motion to dismiss.[8]

DISPOSITION
The order dismissing the information is reversed.
We concur: NEEDHAM, J., and STEVENS, J.[*]
NOTES
[1] Retana suffered serious injuries from the stab wound and was in intensive care at a hospital at the time of the preliminary hearing.
[2] At the time of the interviews, Esparza was serving a 180-day sentence for misdemeanor domestic violence.
[3] It is undisputed that the subpoena was not served on the prosecution.
[4] At various places in the People's opening brief, the People assert Jacinto must establish both knowledge of materiality and bad faith, while urging elsewhere that Jacinto must establish state knowledge of materiality or bad faith. Because we conclude there was no knowledge of materiality and no state action, we need not resolve whether "bad faith" is a separate and distinct concept that the moving defendant must prove in addition to showing the state's knowledge of "materiality."
[5] Accordingly, we do not reach the question of whether a showing of bad faith on the part of the prosecution was required.
[6] People v. Mejia (1976) 57 Cal.App.3d 574, 129 Cal.Rptr. 192, on which Jacinto relies in asserting there was state action, is also distinguishable. In concluding there was state action, Mejia noted that the state authorities, "[k]nowing that material witnesses about to be released would be deported," did not inform the defendant of the action taken and thereby deprived him of an opportunity to interview the witnesses. (Id. at p. 582, 129 Cal.Rptr. 192, superseded by statute on other grounds as noted in People v. Valencia, supra, 218 Cal.App.3d at pp. 811-812, 267 Cal.Rptr. 257.) In contrast, here, state authorities were not aware of the materiality of Esparza's testimony and did not deprive Jacinto of the opportunity to interview Esparza.
[7] Jacinto might also have sought a court order to require the taking of a deposition or the production of witness Esparza pursuant to Code of Civil Procedure sections 1995 and 1997, in which case the materiality of the prisoner's testimony would have to be established under Code of Civil Procedure section 1996.
[8] In light of our decision that dismissal was improper, we will not address the People's argument that the trial court also abused its discretion in dismissing the information.
[*] Retired Associate Justice of the Court of Appeal, First Appellate District, Division Five, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.