Filed 11/26/13  P. v. Charles CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>DERRICK DUPREE CHARLES,<br><br>Defendant and Appellant. | F063975<br><br>(Super. Ct. No. BF134171A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  David R. Lampe, Judge.

Thea Greenhalgh, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Clara M. Levers, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Appellant Derrick Dupree Charles stands convicted of attempted murder, assault with a firearm, possession of a firearm by a felon, and participation in a criminal street gang. He contends his convictions must be reversed because the trial court failed sua sponte to instruct the jury that the testimony of a police officer must be evaluated by the same standards that apply to other witnesses. He also contends the trial court erred in denying his motion to dismiss all charges based upon law enforcement's failure to preserve all evidence. We reject his contentions and will affirm.

## FACTUAL AND PROCEDURAL SUMMARY

On May 31, 2010, Antwan Parker[1] was shot in the left arm and a bullet grazed his head. The shooting occurred in front of Norm's Market at 8th and L Streets in Bakersfield. At the time of the shooting, Charles was an active member of the West Side Crips. Antwan was an active member of the Warlord Bloods. Antwan's gang moniker was "Young" or "Young Snoop."

The Crips and Bloods are two rival African-American gangs in Bakersfield. The location of the market was within the territory of the West Side Crips.

Charles had two teardrop tattoos on the left side of his face, representing prison terms served. He had one teardrop tattoo on the right side of his face, representing the commission of a violent crime. He had "6an6sta" or gangster in large letters tattooed on his abdomen; the number 6 referred to the 6th Street subset of the West Side Crips. Charles was known by the gang monikers "Lil' Derrick," "Diesel," and "Dizzo." His brother, Clarence Wandick, also was a West Side Crip.

In May 2010, Breon Mosley was 15 or 16 years old. He was an active member of the West Side Crips. Mosley had gang tattoos: "106%" indicating he gave 100% to the

---

[1] We will refer to Antwan and his sister, Khadijah Parker, by their first names to avoid confusion.

6th Street subset of the West Side Crips; "Turq Taliban," which was the name of a subset of West Side Crips; and dice with initials "WSGC," standing for "West Side Gangster Crip."

In the spring of 2010, Charles was on parole. He had been equipped with an electronic monitoring device on his ankle. Charles had been informed he had a curfew and that any violation of parole would result in his return to prison. Any tampering with the ankle monitor would cause a signal to be sent informing parole of a violation.

On May 31, 2010, Mosley, a woman named Kierreaye Hester, and another man were at the market. According to Willie Rogers, Mosley, Hester and the second man were outside the market as Antwan walked out. Antwan was talking on his cell phone; he mentioned Mosley's name. When Antwan was a few feet away from Mosley, Mosley said to Antwan "What's Up" with an attitude and the other man, the shooter, yelled "Watch out, Young!" Antwan ran; Mosley and Hester ran after him. The shooter stood his ground, took aim, and fired four to six shots at Antwan.

Bakersfield Police Officer Ryan Kroeker was dispatched to a report of a shooting near the market. While in transit to the location, he was notified that Mosley was a suspect. Antwan was transported to Kern Medical Center, and Kroeker contacted him there.

When Kroeker interviewed Antwan at the hospital, Antwan was crying and in obvious pain. Kroeker tried showing Antwan a photo lineup, including Mosley's photo, but Antwan was unable to identify anyone. Antwan told Kroeker that he had walked to the market with his sister; when they arrived at the market they saw Mosley, Hester, and another male. Mosley called Antwan "Cuz," which made Antwan think he was about to be assaulted; the other man called out "Move!" Antwan turned and ran.

Khadijah told Kroeker she walked to the market with Antwan, but was across the street at the time of the shooting. Khadijah heard gunshots and saw Antwan fall. At the same time, she saw Mosley, Hester, and the second man, who she described as in his late

3.

teens to early 20's, stocky build, and African-American. As the three subjects ran from the market, one of them yelled "Westside Gangster Crip."

Kroeker also interviewed Julie Cartwright at the hospital; she said she was cousins or close friends with Antwan. Cartwright stated that she, Antwan, and Khadijah were driving when their car broke down near the market; Cartwright and Antwan walked to the market. When they arrived at the market, Mosley and Hester were standing outside. When Antwan came out of the market, he was talking on his cell phone and said, "I got Breon right here." Cartwright saw an African-American male, short, with a stocky build, facial hair, and a light complexion, with a semiautomatic handgun.

The night of the shooting, Charles had a curfew violation detected by his ankle monitor. On June 1, 2010, there was a strap violation and Charles's parole officer tried unsuccessfully to contact him. A warrant was issued for Charles's arrest as a parolee at large. Also on June 1, Kroeker arrested Hester.

On June 2, 2010, Bakersfield Police Officer Pete Beagley spoke to Rogers, who identified Charles as the shooter from a photo lineup. Rogers did not know Charles personally, although he had heard someone named "Diesel" was the shooter.

On July 4, 2010, Charles was arrested. He was interviewed at the police station after he was *Mirandized*[2] and agreed to talk. Charles admitted being a member of West Side Crips and stated his gang moniker was "Diesel" or "Diesel 1"; Wandick's moniker was "Diesel 2." Charles claimed he was hanging out with "one of his females" on May 31, 2010, but he declined to provide any contact information for her. Charles had heard about the shooting; he said he cut off his electronic monitor because he had a reputation for shooting and people thought he was the shooter.

On July 12, 2010, Mosley was arrested after he attempted to flee from officers.

---

[2]    *Miranda v. Arizona* (1966) 384 U.S. 436.

4.

While in jail on September 7, 2010, Charles initiated contact with another inmate, Russell Hughes. When Hughes asked why Charles was in jail, Charles responded, "I am here because I shot this little mother fucker in his face." Charles said that during the shooting, he was wearing an ankle monitor and after the shooting, he cut it off.

After this conversation, Hughes contacted the police, hoping the information would lead to a more lenient sentence in his own case. Hughes signed an agreement that in exchange for testifying truthfully in Charles's case and pleading guilty to two counts, Hughes would serve a maximum of one year in custody. Prior to the agreement, Hughes was facing possible prison time.

Charles testified in his own defense. He claimed he was in his own front yard when his ankle monitor showed a curfew violation. He did not remember where he was on the day of the shooting, only that he was with girls. After nine years in prison, he was with two or three women a day and couldn't remember who they were. He denied being with Mosley or Hester on the day of the shooting and stated he was not at Norm's Market that day. Charles denied shooting Antwan. Charles denied making the statements Hughes claimed he made.

On May 24, 2011, an amended information was filed charging Charles with attempted murder, assault with a firearm, participation in a criminal street gang, and possession of a firearm by a felon. Various enhancements also were alleged. Charles entered not guilty pleas to all counts, denied the enhancement allegations, and on that same day jury trial commenced.

On June 2, 2011, the defense filed a motion to dismiss the charges based on destruction of evidence. Following argument by the parties, the trial court denied the motion.

On June 6, 2011, the jury returned a verdict of guilty as to all charges and found all enhancements, except the prior conviction allegations, to be true. In a court trial, the

prosecution dismissed one prior conviction allegation and the trial court found the remaining prior conviction allegation true.

On December 2, 2011, the trial court imposed sentence, including a term of 25 years to life.

## DISCUSSION

Charles raises two challenges to his convictions. First, he contends his convictions must be reversed because the trial court failed sua sponte to instruct the jury that the testimony of a police officer must be evaluated by the same standards that apply to other witnesses. Second, he maintains that law enforcement failed to preserve all evidence, which warrants dismissal of all charges, and the trial court erred in denying his motion to dismiss.

## I.    Jury Instructions

Charles contends the trial court erred in failing to instruct the jury sua sponte that a police officer's testimony is to be evaluated by the same standards that apply to other witnesses and that failure to so instruct violated his federal constitutional right to a fair trial. He is mistaken.

### Factual Background

During voir dire, with the entire panel of potential jurors present, the trial court repeatedly instructed potential jurors on how to evaluate testimony from police officers. The trial court stated:

> "You've heard that there may be a number of sworn peace officers testify in this case …. [¶] … [¶] It is the duty of a juror to evaluate the testimony of each witness according to the same standard. That doesn't mean they end up in the same place in your mind with respect to the accuracy or credibility of their testimony, but you must not automatically assume the accuracy or credibility of the testimony of a peace officer merely because they are a peace officer."

The trial court later explained, again with all potential jurors present, that:

6.

"What's wrong is just to say it's a police officer; so whatever they say, I am going to believe it's credible, it's accurate, not taking into account the human factors and the other factors that you apply to any witness's testimony. Those factors apply to a peace officer just like they apply to anybody else."

With each potential juror that was a correctional or peace officer, related or connected to a correctional or peace officer, or who indicated a desire to be such an officer, the trial court asked whether the potential juror would be able to judge the testimony of a peace officer according to the standards for judging all witnesses. Two potential jurors with connections to law enforcement were sworn as jurors and each had affirmatively stated they could evaluate the testimony of officers under the standards applicable to all witnesses.

Later, during the presentation of the prosecution's case, a witness was delayed. The trial court indicated it intended to take Kroeker's testimony out of order, so the prosecution could continue presentation of its case. The prosecutor advised the trial court that Kroeker was in SWAT training that day.

When Kroeker arrived to testify, he was wearing a SWAT training uniform, which is similar to military camouflage attire. The defense objected to Kroeker being in the courtroom in the SWAT attire, contending it "gives him additional credibility." The prosecutor argued that wearing a SWAT uniform lent no more credibility than "a stark blue police uniform." The trial court overruled the defense objection, noting "we've already been through this in voir dire with the jury, and I don't think it's significantly prejudicial."

Kroeker testified on June 1, 2011, and explained that he presently was assigned to the Kern County Violent Crimes Gang Task Force and the SWAT team and was wearing a standard issue SWAT uniform because he was in SWAT training. Kroeker testified again on June 6, 2011, at which time he wore civilian clothing and testified that on that day, he was on an undercover assignment and thus, wearing civilian clothes.

7.

After informing the jury several times during voir dire that testimony of police officers is to be judged by the same standards as other witnesses, prior to deliberations the trial court formally instructed the jury with CALCRIM No. 226, which states in part: "You must judge the testimony of each witness by the same standards, setting aside any bias or prejudice you may have."

*Analysis*

Charles now contends that the trial court had a sua sponte duty to instruct with more than CALCRIM No. 226 and should have specifically instructed the jury how to assess a police officer's testimony. The defense did not proffer any such instruction at trial; Charles does not cite to any CALCRIM instruction that so instructs; and there is no standard CALCRIM instruction that specifically references the standards for weighing a police officer's testimony.

If Charles wanted a pinpoint instruction about the testimony of police officers and how that testimony is to be evaluated issued to the jury, he should have requested an instruction; the trial court had no sua sponte duty to craft and issue such an instruction. (*People v. Saille* (1991) 54 Cal.3d 1103, 1119.) Charles, however, apparently contends that two cases, *People v. Hill* (1998) 17 Cal.4th 800 and *People v. Cummings* (1993) 4 Cal.4th 1233, require a sua sponte instruction. He is mistaken.

In both *Hill* and *Cummings* the uniformed officer testifying was the bailiff that was in charge of the jury in each case. In both cases, the bailiffs overheard the defendants make incriminating statements and were called to testify to those statements. Under those circumstances, the California Supreme Court indicated that an instruction cautioning the jurors not to accord the bailiff's testimony any additional weight merely because he was the jurors' bailiff should be given. (*People v. Hill, supra,* 17 Cal.4th at pp. 842-843, 846; *People v. Cummings, supra,* 4 Cal.4th at pp. 1290-1291.)

Here, Kroeker was not the bailiff and did not have any contact or relationship with the jurors as did the bailiffs in *Hill* and *Cummings*; those cases do not support a claim that the trial court had a sua sponte duty to issue a special instruction in Charles's case.

To the extent Charles is claiming that Kroeker's testimony in a SWAT uniform somehow bolstered his credibility with the jury, that is mere speculation and, in fact, some jurors may have had a negative reaction to the uniform. (See *People v. Thomas* (1990) 218 Cal.App.3d 1477, 1482.) It is not likely that Kroeker's uniform imbued him with a sense of infallibility in the eyes of the jury; Kroeker testified to misplacing evidence (discussed in part II) and later testified in civilian clothes.

Absent evidence to the contrary and here there is none, we presume the jury understood and followed the instructions given by the trial court, including CALCRIM No. 226. (*People v. Myles* (2012) 53 Cal.4th 1181, 1212.)

Charles's contention is without merit.

## II.    Destruction of Evidence

Charles contends the trial court erred in denying his motion to dismiss because law enforcement failed to preserve all evidence. Specifically, he claims Kroeker should have preserved digital recordings he made of hospital interviews with Cartwright, Antwan, and Khadijah and should have preserved his notes of those interviews. Failure to preserve this evidence was prejudicial to the defense, Charles contends, and warranted dismissal of all charges. We disagree.

### *Factual Summary*

Kroeker interviewed Antwan after he was transported to Kern Medical Center. Kroeker tried to show Antwan a photo lineup, but Antwan was unable to identify anyone. Antwan told Kroeker that when he arrived at the market, he saw Mosley with two other people. Mosley called Antwan "Cuz," which made Antwan think he was about to be assaulted. As Antwan turned and began to run, he heard gunshots, was hit, and fell to the ground.

9.

Khadijah also was interviewed at the hospital. Khadijah was across the street at the time of the shooting; she heard gunshots and turned to see Antwan fall. Khadijah saw Mosley, Hester, and an unknown male running away from the market; one of them shouted "Westside Gangster Crip." The unknown male was black, in his late teens to early 20's, and had a stocky build.

Cartwright was interviewed at the hospital as well. She told Kroeker she was cousins or close friends with Antwan. After their car broke down, she walked to the market with Antwan. When they arrived, Mosley and Hester were outside the market. When Antwan came out of the market, he was talking on his cell phone and said, "I got Breon right here." Cartwright saw a man with a black semiautomatic handgun; the man was black, in his early to mid-20's, short, with a stocky and muscular build, and he had a light complexion and facial hair.

Kroeker recorded the interviews of Antwan, Khadijah, and Cartwright on a digital recorder and also took written notes of the hospital interviews. He relied on the written notes and the recordings in drafting his reports.

At trial, Antwan, Khadijah, and Cartwright all denied making many of the statements attributed to them in Kroeker's report. Antwan denied making statements to Kroeker and being shown a photo lineup. Khadijah claimed she was at her grandfather's house at the time of the shooting, did not hear gunshots, and never identified Mosley, Hester, and the unknown male to law enforcement. Cartwright testified she never told Kroeker that Antwan said, "I got Breon right here."

Kroeker testified that pursuant to department practice, he discarded his notebook with the written notes of the three hospital interviews once the notebook was full. As for the digital recordings, Kroeker testified they were lost and he did not know what had happened to them. He speculated the recordings may have been booked improperly, misplaced, or not extracted correctly. He testified he had made a good faith effort to try and locate the recordings.

10.

Following Kroeker's testimony, the defense made a motion to dismiss based on the destruction or loss of evidence. The defense argued the recordings were material evidence because the three witnesses testified differently at trial than what was attributed to them in Kroeker's report.

The trial court denied the motion, stating: "Here I don't think we have inherently exculpatory material. I think we have potentially useful material for purposes of impeachment …." The defense then proposed a jury instruction addressing lost or destroyed evidence, which the trial court gave.

*Analysis*

The United States Supreme Court has held law enforcement agencies have a duty, under the due process clause of the Fourteenth Amendment, to preserve evidence "that might be expected to play a significant role in the suspect's defense." (*California v. Trombetta* (1984) 467 U.S. 479, 488, fn. omitted (*Trombetta*); accord, *People v. Beeler* (1995) 9 Cal.4th 953, 976.) To fall within the scope of this duty, the evidence "must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (*Trombetta, supra*, at p. 489; *People v. Beeler, supra*, at p. 976).

The state's responsibility is further limited when the defendant's challenge is to "the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." (*Arizona v. Youngblood* (1988) 488 U.S. 51, 57 (*Youngblood*).) In such cases, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." (*Id*. at p. 58; accord, *People v. Beeler, supra*, 9 Cal.4th at p. 976.)

In California courts, the *Trombetta* and *Youngblood* standards are applied in tandem. If evidence has an exculpatory value that is apparent before the evidence was

destroyed, the *Trombetta* approach applies and the state has a duty to preserve it. But "[t]he state's responsibility is [more] limited when" the evidence was merely potentially useful. In that case, the state breaches its duty only if it acts in bad faith. (*People v. Beeler, supra,* 9 Cal.4th at p. 976.)

If a defendant demonstrates that significant exculpatory evidence was lost or establishes bad faith in connection with the loss of potentially useful evidence, then the trial court has discretion to impose appropriate sanctions. (*People v. Medina* (1990) 51 Cal.3d 870, 894.)

Negligent destruction or failure to preserve potentially exculpatory evidence, without evidence of bad faith, will not give rise to a due process violation. (*Youngblood, supra*, 488 U.S. at p. 58.) A finding as to "whether evidence was destroyed in good faith or bad faith is essentially factual: therefore, the proper standard of review is substantial evidence." (*People v. Memro* (1995) 11 Cal.4th 786, 831.) On review, this court must determine whether, viewing the evidence in the light most favorable to the trial court's finding, there was substantial evidence to support its ruling. (*People v. Carter* (2005) 36 Cal.4th 1215, 1246.)

Here, substantial evidence supports the trial court's finding that the recordings and notes made by Kroeker were not material in the constitutional sense, as they were only potentially useful or exculpatory, and there was no bad faith in their loss or destruction.

Prior to the enactment of the criminal discovery statutes, California law did not require law enforcement agencies to retain for discovery purposes notes of witness statements that had been transferred to a formal report. (See, e.g., *People v. Von Villas* (1992) 10 Cal.App.4th 201, 248; *People v. Garcia* (1986) 183 Cal.App.3d 335, 348-350; *People v. Tierce* (1985) 165 Cal.App.3d 256, 261-265; *In re Gary G.* (1981) 115 Cal.App.3d 629, 639-642 (*Gary G.*); *People v. Torres* (1971) 19 Cal.App.3d 724, 731; *People v. Dickerson* (1969) 270 Cal.App.2d 352, 358-360.) The rationale for the rule was explained in *People v. Dickerson*:

"To support such a contention the defense must mean that in connection with any investigation of an alleged crime, everybody carrying on such an investigation must preserve rough notes made for the purpose of ensuring accuracy of their official reports and deliver them upon request to defense counsel in order to give possible grounds for cross-examination of such witnesses; no such rule has ever been propounded; it seems to us that it seeks to carry to a ridiculous extreme the enunciation of 'rights of accused criminals.'" (*Id*. at p. 360.)

The court in *Gary G*. affirmed this rule and refused "to impose a judicial mandate that requires in each and every instance all original notes taken during the investigatory process be retained." (*Gary G., supra*, 115 Cal.App.3d at p. 640.) Instead, the appellate court concluded that "[w]here an officer testifies that he made an accurate report based on the interview notes and thereafter a copy of the report is given to opposing counsel, there can be no cause to complain that all required discovery materials have not been provided and certainly no basis for requiring the officer's testimony be excluded as a result of inability to produce such notes." (*Ibid*.) Finally, the appellate court concluded that due process was satisfied where investigative notes "are incorporated into a formal report, where the officer testifies that the report accurately contains the substance of the information recorded on the notes, and when the report is thereafter turned over to the other side …." (*Id*. at p. 642.)

Here, Kroeker testified that his written notes and the recordings were used to develop his formal report. Kroeker was under no obligation to maintain and preserve his written notes and they were destroyed in accordance with department policy. This comports with constitutional due process. (*Gary G., supra,* 115 Cal.App.3d at pp. 641-642.)

As for the recordings, Kroeker testified he attempted to preserve these and made a good faith effort to locate them. Their loss or destruction, however, does not implicate Charles's constitutional rights. In order to fall within the scope of a state's duty to preserve evidence, the evidence "must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant

13.

would be unable to obtain comparable evidence by other reasonably available means." (*Trombetta, supra*, 467 U. S. at p. 489; *People v. Beeler, supra*, 9 Cal.4th at p. 976.) The recordings are neither.

The duty to preserve evidence arises only with regard to evidence "that might be expected to play a significant role in the suspect's defense." (*Trombetta, supra*, 467 U.S. at p. 488.) "To meet this standard of constitutional materiality, [citation], evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (*Id*. at p. 489.) *Trombetta* does not require that the defendant have access to evidence identical to that which was lost or destroyed. Instead, a *Trombetta* violation occurs only when the defendant is unable to obtain "comparable" evidence by other reasonably available means. (*Ibid*.)

The *exculpatory* value of the recordings is not apparent; if anything, they were inculpatory. Furthermore, the evidence captured by the recordings conceivably was readily available by other means at the time of its recordation and or/loss; specifically, the testimony of the three witnesses. Consequently, under the holding of *Trombetta*, there was no obligation to preserve the recordings.

The state's responsibility is further limited when the defendant's challenge is based on the failure to preserve potentially exculpatory evidence that is, "evidentiary material of which no more can be said than that it could have been subjected to tests, the result of which might have exonerated the defendant." (*Youngblood, supra*, 488 U.S. at p. 57, fn. *.) The mere "possibility" that information in the prosecution's possession may ultimately prove exculpatory "is not enough to satisfy the standard of constitutional materiality." (*Id*. at p. 56; *City of Los Angeles v. Superior Court* (2002) 29 Cal.4th 1, 8.) In that case, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." (*Youngblood, supra*, at p. 58.)

Here, the recordings were only *potentially* useful for the defense as a means to impeach the trial testimony of Antwan, Khadijah, and Cartwright. Moreover, Charles has not demonstrated that anything on the recordings was potentially exculpatory; the testimony of the three witnesses at trial was more favorable to Charles than their statements to Kroeker. (See *People v. Alexander* (2010) 49 Cal.4th 846, 878-879 [defendant's claim that audio tape had exculpatory value was based on speculation].)

Regardless, there is no showing that the loss of the recordings was the result of bad faith. Kroeker testified he made a good faith effort to locate the recordings; he did not know if their loss was the result of being misplaced, improper booking, or improper extraction. Kroeker's testimony constitutes substantial evidence that he did not act in bad faith. The testimony of a single witness is sufficient to prove a disputed fact. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) The negligent destruction of, or failure to preserve, potentially exculpatory evidence, without evidence of bad faith, will not give rise to a due process violation. (*Youngblood, supra*, 488 U. S. at p. 58.)

The trial court did not err in denying the motion to dismiss.

### DISPOSITION

The judgment is affirmed.

_____
Kane, Acting P.J.

WE CONCUR:

_____
Franson, J.

_____
Oakley, J.[*]

_____

[*]     Judge of the Madera Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.